CYNTHIA J. JESIONEK & another *vs.* MASSACHUSETTS
PORT AUTHORITY.

Suffolk. March 7, 1978. — July 25, 1978.

Present: HENNESSEY, C.J., KAPLAN, WILKINS, LIACOS, & ABRAMS, JJ.

*Negligence*, Maintenance of cargo container facility, Forklift, Intox-
icated person, Proximate cause.

In an action for personal injuries sustained at a Massachusetts Port
Authority facility when the rear wheel of a forklift was driven over
the plaintiff's foot, the authority was not relieved of liability for its
negligence in failing to secure the forklift on its premises by the fact
that an intoxicated seaman was taking it for a joyride when the
accident occurred where the actions of the seaman and the result-
ing harm to the plaintiff were reasonably foreseeable. [104–106]

QUESTION OF LAW certified to the Supreme Judicial
Court by the United States District Court for the District
of Massachusetts.

*Ansel B. Chaplin* for the plaintiffs.

*Charles Mark Furcolo* for the defendant.

ABRAMS, J. In this tort action the plaintiff Cynthia J.
Jesionek sought recovery for personal injuries sustained
at the Massachusetts Port Authority's Mystic Container
Facility (facility) when the rear wheel of a forklift was
driven over her foot. After a trial in the United States
District Court, District of Massachusetts, the jury re-
turned a verdict for Mrs. Jesionek.[1] The defendant, Mas-
sachusetts Port Authority (authority), filed a motion for
judgment notwithstanding the verdict. The trial judge
took the authority's motion under advisement and, pur-
suant to S.J.C. Rule 3:21, as amended, 366 Mass. 871

---

[1] The jury made "no finding" for the other plaintiff, Jurgen Je-
sionek.

(1974), certified the following question to this court: "Does the evidence most favorable to the plaintiff . . . warrant submitting the case to a jury under Massachusetts law?" We answer the question in the affirmative.

The evidence most favorable to the plaintiff is as follows.[2] On June 15, 1974, sometime after 4 P.M. the plaintiff and her husband (the Jesioneks) arrived at the facility. The Jesioneks entered the terminal at the normal pedestrian entrance en route to visit a crewman aboard the M/V New England Trapper (Trapper), a container vessel which was berthed at the pier. The authority guard at the gate raised no objections to their entry; it was the authority's policy to allow social guests of officers and crew members to enter the terminal area and to traverse the storage area for containerized cargo for the purpose of visiting the ships. The security guards were aware that the Jesioneks had previously visited the facility on at least eight occasions.

For the month of June, 1974, the normal on-duty complement for the authority's security force at the terminal was two security guards. One security guard was to stand watch at the entrance gate to the facility while the other guard made hourly patrols inside the terminal. Between 4 P.M. and midnight on June 15, 1974, only one security guard was on duty at the facility. He was expected to spend most of his time at the entrance gate and to be away from the gate on patrol as little as possible. As a result, fewer and less thorough patrols were made of the facility, including the pier and the "C & D shed," the storage area for the facility's forklifts, than would have been made if two guards had been on duty.

The authority had in effect specific procedures with respect to securing the forklifts. The security guards were directed to ensure that the forklifts were not operated by

---

[2] The facts have been condensed from the "Agreed Summary of the Evidence" which was submitted with the certified question.

unauthorized persons. After cargo operations ceased, the forklifts were to be parked by their operators inside the "C & D shed," which was then to be locked. If the "C & D shed" was locked prior to the cessation of cargo operations, then the forklifts would be temporarily parked by their operators outside and next to the "C & D shed" and, after all cargo operations ended, the forklifts were to be secured at a different location, namely the mechanics' office near the guards' office and the entry gate.

Between 9 and 9:30 P.M. on June 15 the security guard on duty at the facility made a patrol near the "C & D shed." Cargo operations had terminated and the forklifts had been parked outside the "C & D shed." Although the guard walked within three feet of the forklifts, he did not take any action to secure the forklifts or to check for keys in the ignitions of the machines.

Sometime around 9:30 P.M. an eighteen-year old seaman disembarked from the Trapper and mounted a forklift. The seaman had become intoxicated in the crew's lounge of the Trapper where alcoholic beverages were readily available to crew members when the ship was in dock. The authority was aware that intoxicated crewmen were commonly incident to vessels in port. It was a frequent occurrence for drunken seamen to arrive at the security gate either alone or in the custody of the police. If the seaman was in police custody the police would escort him to his vessel; otherwise the security guard would provide an escort. Once a drunken seaman is on board his vessel there is no physical barrier to his leaving the ship and wandering around the terminal.

The intoxicated young crewman had been "joyriding" on the forklift and operating it in an erratic and dangerous manner for at least fifteen minutes before the accident. The erratic operation included circling, going backwards, stopping and starting, and going behind containers and then reappearing. This forklift was a 5,000 pound hard-tire machine which the authority owned and controlled. The rear wheels, rather than the front wheels,

are used to turn such a vehicle; when the steering wheel of the forklift is turned, the machine moves in the direction opposite to that in which a car would move. When the seaman was operating the forklift, the security guard was in the guard office near the entry gate where he could not see or hear the forklift. No representative of the authority had any knowledge that the seaman was driving the forklift.

At approximately 9:45 P.M. the Jesioneks disembarked from the Trapper. The plaintiff observed the seaman operating the forklift at the end of the pier. The Jesioneks remained in the lee of the gangway because the forklift was being driven by the seaman on the customary walking route to the gate and the pedestrian exit. As the Jesioneks stood there the seaman approached them on the forklift. When the seaman spotted the pair he turned the steering wheel sharply away from them, thus causing the forklift to turn toward the Jesioneks. One of the rear wheels of the machine rolled over the plaintiff's left foot.

After the accident, the forklift which injured the plaintiff was found in the immediate vicinity of the vessel with its key in the ignition. The forklift was identical to the vehicles which the security guard had observed outside the "C & D shed."

The jury could have found that the authority was negligent in failing to secure the forklift on its premises. See *Smith* v. *Eagle Cornice & Skylight Works*, 341 Mass. 139 (1960); *Galbraith* v. *Levin*, 323 Mass. 255 (1948). The issue in this case is whether the wrongful conduct of the intoxicated seaman relieves the authority of liability for this negligence. The authority contends such conduct does absolve it of liability under the line of cases in which this court has held that negligence in leaving keys in the ignition of a parked car is not the proximate cause of injuries resulting from the operation of the car by a thief. See *Galbraith* v. *Levin, supra*; *Ouellette* v. *Bethlehem-Hingham Shipyard, Inc.*, 321 Mass. 390 (1947); *Sullivan* v. *Griffin*, 318 Mass. 359 (1945); *Slater* v. *T.C. Baker Co.*,

261 Mass. 424 (1927). The plaintiff argues that the seaman's actions do not necessarily relieve the authority of liability. In support of this contention she cites a line of cases in which a defendant was found liable for injuries resulting from a third party's use of instrumentalities which the defendant had negligently failed to secure knowing that third parties, who might misuse these items, frequented the area where they were left. See *Martin* v. *Reis*, 344 Mass. 32 (1962); *Smith* v. *Eagle Cornice & Skylight Works, supra; Lane* v. *Atlantic Works*, 111 Mass. 136 (1872).

The general rule is that "[t]he act of a third person, intervening and contributing a condition necessary to the injurious effect of the original negligence, will not excuse the first wrongdoer, if such act ought to have been foreseen. The original negligence still remains a culpable and direct cause of the injury. The test is to be found in the probable injurious consequences which were to be anticipated, not in the number of subsequent events and agencies which might arise." *Lane* v. *Atlantic Works, supra* at 139-140. The cases which have absolved an owner of a vehicle of liability when that vehicle has been stolen constitute a narrow exception to this general rule and represent an independent legal judgment that individuals are not bound to anticipate or guard against the actions of thieves. See *Slater* v. *T.C. Baker Co., supra* at 425. Such an exception to the general principles of negligence liability, however, should be applied only when the specific facts justifying the exception are present. See *Smith* v. *Eagle Cornice & Skylight Works, supra* at 142. Since the vehicle involved in this case was not in fact stolen, the general rule concerning the conduct of third parties and its application in the line of cases cited *supra* control this action.[3]

---

[3] Since we have found the cases involving keys left in ignitions inapplicable, we need not decide whether any modifications of the present law in this area are warranted, see *Hergenrether* v. *East*, 61

Under the facts of this case the jury would have been warranted in concluding that the actions of the seaman were foreseeable. The authority had specific procedures for securing the forklifts whether or not the "C & D shed" was locked. The forklift, which had an unusual steering system, could be dangerous when operated by an unskilled driver. The authority was aware that intoxicated seamen frequented the area, and it was also aware that social guests of officers or crew members routinely visited the ships in port.

It was thus reasonably foreseeable that the forklift, when left unsecured with the keys in the ignition on premises which were solely under the authority's control, would be operated by unauthorized persons, including inebriated seamen who the authority knew had unfettered access to the cargo area. It was also reasonably foreseeable, because of the complexity of the operation of such a dangerous machine, that unauthorized operation would likely cause harm to persons known to pass through the area, such as those visiting the ships. See *Martin* v. *Reis, supra; Smith* v. *Eagle Cornice & Skylight Works, supra* at 139; *Lane* v. *Atlantic Works, supra.* Cf. *Bandanza* v. *Norwood,* 360 Mass. 860 (1971). Consequently, a jury could have found that the plaintiff's injury was caused by a negligent act for which the authority was responsible.

The evidence most favorable to the plaintiff warrants submitting the case to a jury. Our answer to the certified question is therefore "Yes." The Reporter of Decisions is to furnish attested copies of this opinion to the clerk of this court. The clerk in turn will transmit one copy, under the seal of this court, to the clerk of the United States District Court, District of Massachusetts, as answer to the question certified, and will also transmit a copy to each party.

*So ordered.*

Cal. 2d 440 (1964), or whether this exception to general negligence principles should be abandoned, see *Zinck* v. *Whelan,* 120 N.J. Super. 432 (1972).