DONATO DELICATA, individually and as administrator,
vs. ANN BOURLESSES.

Middlesex. March 13, 1980. — May 14, 1980.

Present: GRANT, GREANEY, & DREBEN, JJ.

*Medical Malpractice,* Tribunal. *Negligence,* Medical malpractice.
*Nurse.*

The offer of proof of a husband seeking damages from the defendant, a
nurse, for negligence leading to the death of his wife by drowning
while unattended in a tub was sufficient to raise a legitimate question
of liability before the medical malpractice tribunal convened under
G. L. c. 231, § 60B, where, among documents presented indicating
that the patient suffered from cancer and had suicidal tendencies, a
qualified registered nurse with experience in psychiatric and mental
health nursing stated in a sworn affidavit that she had the opinion that
the patient, to whom the defendant was assigned, "was suicidal,
severely depressed, and exhibited a worsening clinical condition . . .
[which] required visual observations . . . once every fifteen (15)
minutes," that the defendant had the responsibility "to insure that
such observations" were made, that her failure to observe the patient
for the forty-five minute period during which the drowning occurred
amounted to a "deviation from good and acceptable" nursing and
psychiatric and mental health practice, and that the defendant's con-
duct was a "contributing cause of the death." [714-720]

CIVIL ACTION commenced in the Superior Court Depart-
ment on October 18, 1978.

A motion to dismiss was heard by *Hayer,* J., following a
report by a medical malpractice tribunal.

The case was submitted on briefs.

*Dante G. Mummolo & William G. Talis* for the plaintiff.

*Wilson D. Rogers, Jr., & Charles J. Dunn* for the defend-
ant.

GREANEY, J. The plaintiff seeks to recover damages for
the death of his wife, and for loss of consortium, as a result

of the alleged medical malpractice of the defendant, a nurse. The action was considered by a medical malpractice tribunal convened pursuant to G. L. c. 231, § 60B, which concluded that the plaintiff's offer of proof did "not present a legitimate question of liability appropriate for judicial inquiry." The judicial member of the panel ordered that the plaintiff, as a condition precedent to pursuing the action, post the bond required by G. L. c. 231, § 60B. The plaintiff did not file the bond, and the action was dismissed. The plaintiff has appealed from the judgment of dismissal. We have concluded that there was error in the tribunal's finding because the plaintiff's offer of proof was sufficient under required standards to raise a legitimate question of liability appropriate for judicial inquiry.

The offer of proof presented to the tribunal consisted of the following documents: (a) a written statement by the plaintiff; (b) a copy of the records of the New England Deaconess Hospital for the period from November 17, 1975, to November 22, 1975, when the plaintiff's wife was confined to the psychiatric ward for treatment for a depressive reaction after her first suicide attempt; (c) a copy of the patient incident report concerning the death of the plaintiff's wife; (d) her death certificate; (e) a copy of the further answer of the hospital to one of the plaintiff's interrogatories, and (f) the affidavit of Heidi A. Scholten, a registered nurse, dated February 19, 1979, which expressed the opinion, based on her examination of the material in the foregoing documents, that the standard of nursing care provided by the defendant to the plaintiff's wife on the night she committed suicide deviated from good and acceptable nursing practice.

We summarize the proof offered by the plaintiff without attempting to pass on the weight or credibility of any of the evidence offered. In March, 1975, the deceased, Carmela Delicata, then age thirty-nine, was suffering from cancer. In March, 1974, she had undergone a left mastectomy. This operation was followed in January, 1975, by a right pleural effusion and oophorectomy. Some time after her

last surgery, she was informed that the cancer had metastasized to her bones and she commenced chemotherapy. In the late summer of 1975 her over-all condition caused her to become depressed. On November 15, 1975, while at home and in the presence of her daughter, she attempted suicide by placing a towel around her neck and choking herself. As a result of this incident she was treated at the Newton-Wellesley Hospital, and on November 17, 1975, she was transferred from that facility to the psychiatric ward of the New England Deaconess Hospital. The nurses' notes in the New England Deaconess Hospital record reveal that on November 18, 1975, she was "[t]ense, anxious and worried [that] she would have a nervous breakdown . . . Frightened . . . Very depressed wants to die." On November 19, 1975, she expressed a desire to commit suicide and asked the staff "to assist in this task of suicide." She was placed under constant supervision but was seen by a staff psychologist, who "advised that patient should not be under supervision constantly." The hospital records reveal that she was also examined on November 19 by a staff psychiatrist, who felt that suicidal precautions were not necessary. On November 20, 1975, she attempted to refuse her chemotherapy medication, stating she wanted to "give up" and that she felt as if she were "going crazy and losing her memory." On November 21, 1975, she was observed by the nurses to be "[a]ngry and defensive. Extremely [down] . . . [Feels] she is not worth attention. Stating she is 'crazy' and feels it is time to go to the 'nuthouse.' Fearful and depressed . . . Seems bewildered . . . ." On November 22, 1975, she was again examined by the staff psychiatrist, who urged that "she have ECT [electroshock therapy] beginning on November 24th . . . [I] asked her to discuss this when her husband visited that evening. She was somewhat resistant to the idea of treatments and reassurance was not helpful." That evening, another patient overheard and related to the staff a conversation between the deceased and her husband, in which she told her husband that this was a "nuthouse" and she "wanted to die." Her husband apparently replied that

he was disgusted with her and left shortly thereafter. The balance of the nurses' notes in the record for that night is as follows:

"Patient last seen at 9:00 P.M. when she went to draw up a bath. At 9:40 went in search of patient. Door to bathroom locked. Called her name twice — no answer — went to get master key to unlock door. Found patient fully clothed submerged in water filled tub. Pulled from water to half-sitting position. Patient's face was purple. Pounded on chest. No respiration, pulse or response. Upon pounding chest projectile gush of fluid from mouth. Mayday called. Attempted resuscitation without success. Patient pronounced dead 10:10 P.M. Dr. Sheldon notified — medical examiner notified."

The progress notes of the psychologist begin with the diagnostic impression of "[d]epressive reaction (moderate)" on November 17, and end with the conclusion on November 21 that the patient was "[v]ery depressed." During her hospitalization she was confined to rooms without bath or shower facilities and, according to the plaintiff, "[f]or her to take a bath or shower she had to go out to another room specially for the purpose of taking a bath or shower." The cause of death was listed on the death certificate as "asphyxia due to drowning (while depressed). Generalized carcinomatosis secondary to mammary carcinoma." In a further answer by the hospital to the plaintiff's interrogatories, the defendant was identified as its employee assigned to the deceased's care on November 22, 1975, between 3:00 P.M. and 11:30 P.M.

Heidi A. Scholten, a qualified registered nurse with experience in psychiatric and mental health nursing,[1] stated in

---

[1] The affidavit indicates that Ms. Scholten is a graduate of the University of Massachusetts School of Nursing and holds the degree of Bachelor

a sworn affidavit that she had examined the foregoing documents and that, based on the facts contained therein and on her own educational training, knowledge and professional experience in the field of psychiatric and mental health nursing, she had the opinions: (1) that "both the nursing notes and nursing assessment report indicated that Mrs. Delicata was suicidal, severely depressed and exhibited a worsening clinical condition"; (2) that "[t]he clinical condition of Mrs. Delicata . . . warranted and required visual observations of her at least once every fifteen (15) minutes"; (3) that the defendant, in particular, because she was assigned to the patient, had the responsibility "to insure that such visual observations . . . were made"; (4) that the defendant's failure to observe the patient for a forty-minute period amounted to a "deviation from good and acceptable [n]ursing [p]ractice and [p]sychiatric and [m]ental [h]ealth [n]ursing [p]ractice"; and (5) that the defendant's conduct was a "contributing cause of the death."

It was the duty of the tribunal to evaluate the evidence summarized above in a manner comparable to what a judge presiding at a civil trial would do in ruling on a defendant's motion for a directed verdict. *Little* v. *Rosenthal,* 376 Mass. 573, 578 (1978). *McMahon* v. *Glixman,* 379 Mass. 60, 66 (1979). *Kapp* v. *Ballantine,* 380 Mass. 186, 191 (1980). *Flagg* v. *Scott, post* 811 (1980). Under this standard, the plaintiff, in order to sustain a cause of action in negligence for medical malpractice against the defendant, was obliged to establish: (1) that a nurse-patient relationship existed between the defendant and the plaintiff's wife; (2) that the defendant's conduct failed to conform to good

---

of Science in nursing, that she is a registered nurse, that she has educational training, knowledge and professional experience in the field of psychiatric and mental health nursing, and that she has served as both a staff and a charge nurse at McLean Hospital in Belmont, a psychiatric and mental health facility. These qualifications were sufficient to permit the tribunal to receive and consider her opinions in keeping with the requirements described in *Kapp* v. *Ballantine,* 380 Mass. 186, 192 (1980), for expert testimony offered to a tribunal.

nursing practice because the defendant failed to provide the deceased with the degree of skill and care expected of the average nurse under the circumstances; and (3) that the defendant's negligence was a contributing cause of the death.

The further answer of the hospital to the plaintiff's interrogatory that the defendant was the hospital employee assigned to the deceased's care between 3:00 P.M. and 11:30 P.M. on November 22, 1975, establishes the first element. *Nickley* v. *Eisenberg*, 206 Wis. 265, 268 (1931). Indeed, the defendant's brief concedes that, taken in the most favorable light, the plaintiff's offer of proof established that "there was a duty owed to the plaintiff's decedent by defendant nurse . . . to the extent that the plaintiff established that nurse Bourlesses was assigned to the care of the plaintiff's decedent [on the night in question]." The opinions expressed in the affidavit of the plaintiff's expert, based on the facts contained in the documents she examined, were sufficient to establish the scope of the duty owed by the defendant and to warrant a finding that that duty had been breached. The plaintiff's expert indicates that the hospital records available to the nursing staff would alert a reasonably competent nurse in a similar situation that Mrs. Delicata's clinical condition was worsening throughout her stay at the hospital. The affidavit raises the inference that on the evening of November 22, 1975, the deceased had a motivation and desire to commit suicide. The deceased's adverse reaction earlier in the day to the notion of electroshock therapy, together with her comments to her husband that she wanted to die and his expression of disgust with her (both of which were brought to the attention of the staff), and her exit at 9:00 P.M. from her room into a separate bathroom for a bath, and remaining in the bathroom without a check for forty minutes, warrant a finding that the deceased had been left in a potentially dangerous situation unattended and unobserved for an unreasonably lengthy period of time. The affidavit of the plaintiff's expert also permits the conclusion that, despite the psychiatrist's finding three days before that suicidal precautions

were unnecessary, a reasonably skillful nurse in the defend-
ant's position would, at a minimum, have monitored Mrs.
Delicata during the bath, based on the patient's condition
that evening, or should either have instituted closer supervi-
sion on her own initiative or sought permission from a staff
physician to implement stricter controls.  The opinions ex-
pressed by the plaintiff's expert properly define the ap-
propriate legal standard of care (*Brune* v. *Belinkoff*, 354
Mass. 102, 109 [1968]) and are in keeping with the require-
ment that in the usual medical malpractice case the jury
must be guided by expert medical opinion in order to deter-
mine whether the conduct of the medical defendant toward
the patient violates the special duty which the law imposes
as a consequence of a particular medical relationship.  See
*Semerjian* v. *Stetson*, 284 Mass. 510, 514-515 (1933); *Bouf-
fard* v. *Canby*, 292 Mass. 305, 309 (1935); *Klucken* v. *Levi*,
293 Mass. 545, 550-551 (1936); *Tallon* v. *Spellman*, 302
Mass. 179, 182-183 (1939); *Vartanian* v. *Berman*, 311 Mass.
249, 253 (1942); *Berardi* v. *Menicks*, 340 Mass. 396, 400-402
(1960); *Ramsland* v. *Shaw*, 341 Mass. 56, 61-62 (1960); *Er-
ban* v. *Kay*, 342 Mass. 779 (1961); *Haggerty* v. *McCarthy*,
344 Mass. 136, 139-140 (1962); *McCarthy* v. *Boston City
Hosp.*, 358 Mass. 639, 643-645 (1971); *Murphy* v. *Conway*,
360 Mass. 746, 749-750 (1972); *Broderick* v. *Gibbs*, 1 Mass.
App. Ct. 822 (1973); *Cinis* v. *Post*, 1 Mass. App. Ct. 859,
860 (1973) — all cases where it has been held that a jury
could not rely on common knowledge and experience with-
out the aid of expert medical testimony to conclude that cer-
tain questioned medical conduct constituted malpractice.
See also Annot., "Nurse's Liability for Her Own Negligence
or Malpractice," 51 A.L.R. 2d 970 (1957).

The element of causation presents a question of fact for
the jury.  *Zezuski* v. *Jenny Mfg. Co.*, 363 Mass. 324,
328-329 (1973), and cases cited.  The assertion by the plain-
tiff's expert, based on her review and assessment of the
medical facts in the documents, that the defendant's con-
duct was "a contributing cause of the death" would warrant
a conclusion by a rational jury that closer supervision of the

deceased by the defendant in the course of the evening and particularly during the bath might have averted the incident. There is nothing in the record to support the notion that the opinion by the plaintiff's expert as to causation is based on conjecture. "Where the relation of cause and effect between two facts has to be proved, the testimony of [a medical] expert that such relation exists or probably exists is sufficient . . . ." *Berardi* v. *Menicks*, 340 Mass. at 402. Finally, because the offer of proof was sufficient to show probable malpractice on the part of the defendant, the tribunal should not have excused or exonerated the defendant from responsibility on the basis of perceived negligence on the part of other medical personnel charged with the deceased's care. The question of possible negligence by other tortfeasors was not properly before the tribunal, and, in any event, a particular tortfeasor would not be relieved of liability for the entire harm she has caused just because another's negligence might also be a factor in effecting the injury. The established rule is that an injured party is permitted to sue a tortfeasor for the full amount of damages for an indivisible injury that the tortfeasor's negligence was a substantial factor in causing, even if the concurrent negligence of others contributed to the incident. *Galli* v. *Drapeau*, 216 Mass. 144, 146 (1913). *Burke* v. *Hodge*, 217 Mass. 182, 184-185 (1914). G. L. c. 231B. Restatement (Second) of Torts §§ 875 and 879 (1979). Prosser, Torts § 47, at 297-299, and § 52, at 314-315 (4th ed. 1971).

The judgment, the order for a bond and the present finding and decision of the tribunal are all vacated; that finding and decision are to be replaced by a new finding and decision to the effect that the plaintiff's offer of proof discussed in this opinion is sufficient to raise a legitimate question of liability appropriate for further judicial inquiry.

*So ordered.*