GENA GLICKLICH & another *vs.* ALAN SPIEVACK & another.

Middlesex. January 11, 1983. — August 8, 1983.

Present: HALE, C.J., ROSE, & PERRETTA, JJ.

*Negligence,* Medical malpractice, Proximate cause, Loss of parental socie-
ty. *Doctor. Parent and Child,* Companionship and society. *Practice,
Civil,* Judgment notwithstanding verdict.

In a medical malpractice action to recover damages for the alleged negli-
gent failure of two physicians correctly to diagnose and treat a
patient's breast cancer, the jury were entitled to conclude that the pa-
tient would have had a biopsy if either defendant had advised her to
do so, where there was no evidence that such advice would not have
been heeded. [492-493]
In a medical malpractice action, expert testimony that, to a reasonable
medical certainty, the patient would not have had brain metastasis
and would have had a much improved chance of survival or longer life
if treatment of her breast cancer meeting accepted standards of
medical care had been appropriately initiated was sufficient to meet
the plaintiff's burden of proof as to proximate cause. [493-495]
In an action by a mother and her minor son arising out of the alleged fail-
ure of the defendant physicians properly to diagnose and treat the
mother's breast cancer, the jury could properly award damages to the
son for loss of parental society and guidance. [496]
The evidence in a medical malpractice action, and the judge's instructions
to the jury to which no objection was made, provided a reasonable
basis for the jury to apportion the damages and assess disparate liabili-
ty against two physicians, and they were not required to find the
physicians liable as joint tortfeasors. [496-498]

CIVIL ACTION commenced in the Superior Court Depart-
ment on April 30, 1980.

The case was tried before *Morse,* J.

*Clyde D. Bergstresser (Mary P. Squiers* with him) for the
plaintiffs.

*Raymond J. Kenney, Jr.* for Alan Spievack.

*John A. Johnson (Joseph B. Bertrand* with him) for Joan R. Golub.

HALE, C.J.   Gena Glicklich brought this malpractice action on behalf of herself and her son to recover for damages sustained as a result of the alleged negligent failure of the defendants, Drs. Golub, Jones, and Spievack, correctly to diagnose and treat her breast cancer.   The jury returned verdicts for the plaintiffs as to Doctors Golub and Spievack, awarding $307,700 to Gena Glicklich and $92,275 to her son, Evren Celimli.   A verdict was returned in favor of Dr. Jones.   On special questions, the jury found that the plaintiff had been free of negligence and that Dr. Golub had caused $59,996 of the total damages, the remainder having been caused by Dr. Spievack.

Drs. Spievack and Golub each moved for judgment notwithstanding the verdict. The trial judge granted the defendants' motions, finding that there was insufficient evidence upon which a jury could conclude that any malpractice on the part of Dr. Spievack or Dr. Golub was causally related to damage sustained by the plaintiffs. The judge went on to hold that if the defendants were liable, then the jury would be warranted in finding that Evren Celimli was economically dependent on his mother and in awarding him damages and finding that Dr. Golub was liable only to the extent of $59,996 (implicitly finding that she was not a joint tortfeasor with Dr. Spievack and that Dr. Spievack's negligence was not foreseeable by her). Because the trial judge was "in doubt as to whether the rulings on the motions for judgment notwithstanding the verdict are correct" he reported those three rulings to this court.

In determining whether the judge acted properly in entering the judgment n.o.v., we apply the same standard of review as would apply to a review of a motion for a directed verdict.   *D'Annolfo* v. *Stoneham Housing Authy.,* 375 Mass. 650, 657 (1978).   *Moran Travel Bureau, Inc.* v. *Clair,* 12 Mass. App. Ct. 864 (1981).   We therefore must determine whether "anywhere in the evidence, from whatever source derived, any combination of circumstances

could be found from which a reasonable inference could be drawn in favor of the plaintiff." *Raunela* v. *Hertz Corp.*, 361 Mass. 341, 343 (1972), quoting from *Kelly* v. *Railway Exp. Agency Inc.*, 315 Mass. 301, 302 (1943). *Miles* v. *Edward O. Tabor, M.D., Inc.*, 387 Mass. 783, 786 (1982).

Viewing the evidence in that light, the jury could have found the following facts. In August, 1978, the plaintiff first felt a lump the size of a baby fingernail in her right breast. On August 17, 1978, she saw Dr. Golub, her physician at that time, with regard to the lump and blackish-green nipple discharge which she had been experiencing. Dr. Golub performed a physical examination of the plaintiff's breasts, took smears of nipple discharge, and advised the plaintiff to return in a week for a needle aspiration of the lump. The needle aspiration was performed on August 31, 1978, at which time there was no gross fluid return, and the lump did not collapse. Dr. Golub advised the plaintiff to call for the results of the lab report on the aspiration. The plaintiff was not advised to have any further procedures. She informed Dr. Golub that she would be attending Harvard in September and therefore would take advantage of the Harvard University Health Service (Health Service). She requested that Dr. Golub forward her records to the Health Service.

In September, 1978, the plaintiff called Dr. Golub for the results of the needle aspiration. Dr. Golub told the plaintiff that the lab report was negative and that she had nothing to worry about. However, due to the continued presence of the lump and nipple discharge, the plaintiff saw Dr. Jones at the Health Service in November, 1978. Dr. Jones found no predominant mass in either breast and diagnosed the plaintiff's condition as fibrocystic disease. The plaintiff was not told to return for a follow up with regard to her breast condition. In January, 1979, the plaintiff saw a Dr. Jessiman at the Health Service for another opinion on the breast lump. Dr. Jessiman was concerned about the lump and suggested that the plaintiff see a surgeon to determine if a biopsy was necessary.

Due to illness, the plaintiff did not seek a surgeon's opinion until February 6, 1979, at which time she saw Dr. Spievack at the Health Service. The plaintiff was still worried about the lump because it seemed to be getting larger. Following a physical examination, Dr. Spievack diagnosed the condition as cystic disease or papilloma and advised the plaintiff to have a mammogram. No other procedure was advised. The plaintiff had the mammogram on February 12, 1979, and on February 13 was told by Dr. Spievack that she did not have cancer and that she should return in two months.

On April 2, 1979, the plaintiff returned to Dr. Spievack with increased breast tenderness; she felt the lump was getting larger; and she was experiencing soreness under her arms. Dr. Spievack discussed with the plaintiff a study linking chocolate and coffee consumption with fibrocystic disease and told her to stop her use of these products and to return in two weeks. Because the plaintiff had not stopped drinking coffee and felt there had been no changes in the breast lump, she did not return to Dr. Spievack.

Finally, in May, 1979, the plaintiff again returned to the Health Service for yet another opinion on the lump which she felt was still getting larger and more painful. She saw a Dr. Eldred, who suggested that the plaintiff see a gynecologist. Unfortunately, the plaintiff was unable to get an appointment until June 15. Because the pain was getting worse, the plaintiff tried to get an earlier appointment but could not. When seen on June 15, 1979, by a Dr. Federschneider, she was told to see a surgeon immediately. She saw a Dr. Hechtman at Peter Bent Brigham Hospital that afternoon. He advised a biopsy which was performed on July 6, 1979, and revealed inoperable breast cancer. A regimen of chemotherapy and radiation was implemented and appeared to improve the plaintiff's condition, but in May of 1980, following a seizure, the plaintiff was diagnosed as having brain cancer as a result of metastasis of the primary breast cancer.

There was testimony at trial that good medical practice requires that a biopsy be advised following a needle aspiration in which gross fluid is not returned and that when Dr. Golub failed so to advise the plaintiff in August, 1978, her treatment of the plaintiff fell below standard practice.[1] Several experts also testified that Dr. Spievack's treatment of the plaintiff violated accepted medical practice when he failed to advise the plaintiff to have a biopsy on February 6, February 13, and April 2, 1979.[2] The trial judge did not report any issue with regard to the determination that Drs. Golub and Spievack were negligent, and we therefore proceed on the assumption that they were indeed negligent. We turn now to the issues reported.

1. *Proximate Cause.*

The burden is on the plaintiff to establish a causal connection between the negligence of the defendants and any damages she suffered. *Semerjian* v. *Stetson,* 284 Mass. 510, 512 (1933). *Samii* v. *Baystate Medical Center, Inc.,* 8 Mass. App. Ct. 911, 912 (1979). In medical malpractice cases this causal connection must generally be established by expert testimony that the injury sustained was more probably than not a result of the doctor's negligence. *Berardi* v. *Menicks,* 340 Mass. 396, 402 (1960). See *Delicata* v. *Bourlesses,* 9 Mass. App. Ct. 713, 720 (1980). Testimony that such a

---

[1] There was also expert testimony that Dr. Golub's treatment was not in accordance with good medical practice when she failed to forward, on her own initiative, records to the Health Service and failed to correct an error on the cytology slip which indicated the wrong location of the needle aspiration before forwarding records to the Health Service. The experts further testified that the follow-up plan indicated in her records of August 31, 1978, and in a cover letter to the Health Service in November, 1978, were inadequate. Because the causal connection to damages suffered by the plaintiff is more tenuous for these acts than for the failure to advise a biopsy in August, we focus primarily on the latter failure.

[2] One expert testified that Dr. Spievack's conclusion that the lump he palpated in February was not the same lump aspirated in August violated good medical practice. However, because Dr. Spievack testified he probably would not have done anything differently had he known the true location of the aspiration, there is no causal connection between this conclusion and the plaintiff's injuries.

relation is possible, conceivable, or reasonable, without more, is insufficient to meet this burden. *DeFilippo's Case,* 284 Mass. 531, 534-535 (1933). *Berardi* v. *Menicks, supra.* The liability of the defendants was not to be determined by the jury upon consideration of contingent, speculative, and possible results of treatment which might have been utilized to remedy or mitigate the consequences of the plaintiff's cancer, but upon proof to a fair preponderance of the evidence that had proper treatment been administered, she most probably would not have been injured to the same extent. *Tucker* v. *Stetson,* 233 Mass. 81, 84 (1919). See *Cinis* v. *Post,* 1 Mass. App. Ct. 859, 860 (1973).

The judge concluded that the plaintiff had failed to meet the burden of proving proximate cause, in part, because she had failed to demonstrate that she would have had the biopsy had Drs. Golub or Spievack so advised her. The law presumes, however, that a warning, if given, will be heeded. *Wolfe* v. *Ford Motor Co.,* 6 Mass. App. Ct. 346, 352 (1978). "The jury were free to [conclude that the plaintiff would have had the biopsy] absent some negating evidence binding on the plaintiffs." *Ibid.* No such evidence was present in this case.

The primary expert on causation was a Dr. Robbins. The judge was troubled by his testimony that the rate of spread of cancer "is completely undefinable on an exact level" and that he was unable to predict the rate of growth or metastasis in any particular person. The judge stated, "Given Dr. Robbins' testimony . . . I do not know how I, let alone the jury, could have rationally determined what damage was caused by the inevitable course of Gena's cancer, and rationally assessed damages." On careful review of the entirety of Dr. Robbins' testimony, however, we believe that, while the case is a close one, there was sufficient evidence upon which the jury could have found the requisite causal connection.

With regard to Dr. Golub, Dr. Robbins testified to a reasonable medical certainty that had proper medical care been rendered the plaintiff in August, 1978, the plaintiff's

life expectancy would have been about 94% for a ten-year follow-up period and 80% for a fifteen-year period. By February, 1979, the plaintiff only had a 50% or less chance of ten-year survival with proper treatment.[3] Based on the records Dr. Robbins concluded that the plaintiff's cancer was allowed to progress from "Stage I" (the earliest, most curable stage of cancer)[4] in August, 1978, to either late

---

[3] We note that no question was raised at trial with respect to the testimony of shortened life expectancy. Furthermore, there was no objection to the judge's charge on that issue, which was as follows: "If in this case, you are persuaded that injury has shortened the life of the plaintiff, you can take into consideration that matter as an element of damages apprehensions, fears, consequential suffering caused to her as a result of contemplating that fact if you find that she knows about it. It will not as suggested in the case talking about the value of what her life would have been after her death, if you find that event is only her apprehension of that consequence."

"Now, if you find her life expectancy is foreshortened, and it is going to last only X years, she may not recover for loss of enjoyment that she otherwise would have had had she lived. But she may or more — I will leave it at that. She may not recover for loss of enjoyment of life beyond what you find her actual life expectancy is. The loss of expectation of that, insofar as that affects her mental status during the time that you find she will live is a proper element of damages as I previously explained. When you are talking about earning capacity, additional costs you are measuring it as it existed just prior to injury attributable to one or more of the defendants and may properly consider in that case the earning capacity of the plaintiff, age, training, education, skill and industriousness as well as evidence received by one pursuing an occupation similar to which you the jury find the plaintiff would be qualified and evidence of the market value of services of somebody with the plaintiff's qualification may be considered by you if you find it probative in determining what her earning capacity was."

[4] According to expert testimony and medical literature admitted in evidence, a number of clinical staging systems for cancer have been developed in which clinical characteristics are used to determine a prognostic category for each patient. Included in Stage I are cancers involving a tumor less than 2 cm. in diameter. Lymph nodes, if present, are not felt to contain metastases. Stage II includes those cancers less than 5 cm. in diameter. Lymph nodes, if palpable, are not fixed. Stage III involves tumors greater than 5 cm. in diameter or any tumor with invasion of skin, or attached to the chest wall or involving nodes in the supraclavicular area. Any cancer with distant metastases (as from breast to brain) is classified as Stage IV. Henderson & Canellos, Cancer of the Breast — The Past Decade 302 New Eng. J. Med. No. 1 at 17, 18 (1980).

Stage I or early "Stage II" by February, 1979. There was other expert testimony that the prognosis worsens as the stage of the cancer progresses.

As to Dr. Spievack, Dr. Robbins stated that had proper treatment been initiated within two to four weeks of the plaintiff's first visit to Dr. Spievack, as required by the accepted standard of care, the plaintiff probably would not have had the brain metastasis. Her life expectancy decreased from a 50% or less chance of ten-year survival in February, 1979, to a life expectancy of "possibly a year or two years at the outside" at the time of trial in February, 1981. Moreover, the plaintiff's cancer had progressed from a late Stage I or early Stage II in February, 1979, to "Stage IV" (the most advanced stage) at the time of trial.

Despite his inability to state precisely at what point in time the plaintiff's cancer metastasized or became inoperable, Dr. Robbins persisted in his assertion that he could predict with reasonable medical certainty, based on the stage of the disease, what would have happened to the plaintiff had she received treatment meeting the accepted standard of care.

Although the plaintiff was "required to show a causal relationship between the defendant[s'] negligence and [her] injuries . . . [she was] 'not required to show the exact cause of [her] injuries or to exclude all possibility that they resulted without fault on the part of the defendant[s]'" *Samii* v. *Baystate Medical Center, Inc.,* 8 Mass. App. Ct. at 912, quoting from *Woronka* v. *Sewall,* 320 Mass. 362, 365 (1946). See *Anderson* v. *Nixon,* 104 Utah 262, 269-270 (1943); *Hicks* v. *United States,* 368 F.2d 626, 632 (4th Cir. 1966). The testimony of Dr. Robbins, that to a reasonable medical certainty the plaintiff would not have had the brain metastasis and would have had a much improved chance of survival or longer life if treatment meeting accepted standards of care had been appropriately initiated, was sufficient to meet the plaintiff's legal burden with regard to proximate cause.

2. *Award to Evren Celimli.*

The defendant Spievack claims that there was no evidence that Evren Celimli was economically dependent upon his mother, Gena Glicklich, and that, therefore, his claim for loss of parental guidance and society must fail. The judge found that if the jury had a factual basis to find liability, the verdict for loss of parental society should stand. We agree.

In *Ferriter* v. *Daniel O'Connell's Sons,* 381 Mass. 507, 516 (1980), the Supreme Judicial Court allowed a claim for loss of parental guidance and society stating: "We hold that the Ferriter children have a viable claim for loss of parental society if they can show that they are minors dependent on the parent, Michael Ferriter. This dependence must be rooted not only in economic requirements, but also in filial needs for closeness, guidance, and nurture." The court recognized that a child has an interest "in the society and affection of the parent, at least while he remains in the household," and that allowing a claim for a child's loss of parental society met part of that demand. *Id.* at 516-517, quoting from Pound, Individual Interests in the Domestic Relations, 14 Mich. L. Rev. 177, 185-186 (1916).

It is clear from *Ferriter* that the injured parent need not be the principal wage earner in order for the child to recover for loss of parental society. It is sufficient if the child is living in the injured parent's household and is dependent on the parent for management of the child's needs and for emotional guidance and support.

The evidence in this case established that Evren was nine years old at the time of trial and was living with his mother. Gena routinely prepared Evren's meals, discussed his day with him, read him stories and generally took an interest in his play, school and friends. This was sufficient evidence upon which the jury could award damages to Evren for the loss of parental society and guidance he suffered as a result of the negligence of the doctors.

3. *Apportionment of Damages.*

Dr. Spievack argues that Dr. Golub must be found liable as a joint tortfeasor and that the plaintiff suffered a single

indivisible injury requiring any award of damages to be in a single amount against both of the defendants. The judge rejected this contention, and we agree with him.

The judge instructed the jury without objection that each defendant should be found liable only for those damages which were the natural and probable consequence of his or her acts and that the subsequent acts of a third person aggravating the prior injury may or may not be found to be a natural and probable consequence of the original negligence. The jury were further instructed that they could, but were not required to, find that the acts of the defendants were independent acts allowing an apportionment of damages. It was, therefore, open to the jury on the evidence to find that Dr. Golub was not legally responsible for the damages resulting to the plaintiff from Dr. Spievack's negligence, as his acts were not foreseeable by her.

The cases relied upon by the defendants permitted but did not require the jury to find Dr. Golub liable as a joint tortfeasor. See *Morrison* v. *Medaglia*, 287 Mass. 46, 49, 51 (1934); *Jesionek* v. *Massachusetts Port Authy.*, 376 Mass. 101, 105-106 (1978). See also *Gray* v. *Boston Elev. Ry.*, 215 Mass. 143, 147-148 (1913).

Damages may be apportioned among two or more causes if there is a reasonable basis for doing so. Restatement (Second) of Torts § 433A (1965). There was evidence from which the jury could have found that due to Dr. Golub's negligence the plaintiff's life expectancy was shortened from a 94% chance of ten-year survival in August, 1978, to a 50% or less chance of ten-year survival by February 6, 1979, and that her cancer progressed from a Stage I cancer to a late Stage I or early Stage II cancer during this same period. The jury could have held Dr. Golub responsible for these conditions, then chosen to shift responsibility for any further damages incurred by the plaintiff to Dr. Spievack. See Restatement (Second) of Torts § 452(2). There was substantial evidence of dramatic deterioration of the plaintiff's condition after she first saw Dr. Spievack. Experts testified that Dr. Spievack's negligence resulted in an inoper-

able breast cancer, subsequent brain metastasis and a vastly shortened life expectancy for the plaintiff. This testimony provided a reasonable basis for apportioning the damages and for the disparate liability assessed by the jury against Drs. Golub and Spievack.

The judgment n.o.v. is reversed and judgment is to enter for the plaintiffs on the jury verdicts.

*So ordered.*