Billings, Thomas P., J.
A. Introduction.
These cases, consolidated for all purposes, arise out of an explosion on July 15, 2002 at 320 Bent Street, Cambridge. 320 Bent Street was a new building, then in the final stages of construction, owned by Lyme Properties, Inc., whose subrogee American Insurance Company (“AIC”) is the plaintiff in No. 03-4929. The space in which the explosion occurred was being readied for occupancy by Microbia, Inc., whose sub-rogee Great Northern Insurance Company is the plaintiff in No. 04-618.
There is ample evidence, and the parties do not appear to dispute (at this juncture at least), that the explosion was fueled by an accumulation of natural gas in Cold Room 442, one of two cold rooms in the Microbia space. The gas was unscented, and ignited when a maintenance worker, getting the space ready for Microbia’s occupancy, was operating an electric floor buffer in the room. The issues raised by the motions before me concern whether the claims asserted by AIC are viable in the face of a contractual waiver-of-subrogation clause and — if they are— whether certain defendants are responsible for the gas having entered the room, or for its not having been ventilated out.
All motions and oppositions were capably documented, briefed, and argued. This opinion will assume familiarity with the underlying facts, and will therefore discuss those facts only insofar as necessary to communicate adequately the reasons for the decisions reached herein.
B. Motions for Summary Judgment of Defendants Arrowstreet, Inc., AHA Consulting Engineers, Inc., Siena Construction Corp., American Plumbing and Heating Corp., Minus Eleven, Inc., and Fred Williams, Inc. — Waiver of Subrogation Clauses.
All defendants remaining in the case have moved for summary judgment on the ground that recovery is barred by “Waiver of Subrogation” clauses found in section 1.3.7.4 of the Agreement Between Owner and Architect (under which Arrowstreet and AHA performed services)[1] and section 11.5 of the General Conditions to the Contract for Construction (under which general contractor Siena and subcontractors American Plumbing and Heating, Minus Eleven, and Fred Williams provided services)[2] bar recovery. Both clauses provide, in somewhat different language, that each contracting party waives claims for damages against the other(s), to the extent that those damages are covered by the claiming party’s insurance.
This being a subrogation case — in which all damages claimed by AIC were, by definition, covered by the Owner’s insurance — the defendants argue that the claims against them were waived. AIC responds that as a matter of law grounded in public policy, the waiver of subrogation clause does not extend to damages caused by a defendant’s gross negligence, or its violation of a statute or regulation. Additionally, AIC argues, only Siena — not its subcontractors — are protected by the waiver of subrogation in the General Conditions.
These legal arguments were considered early in the case, in decisions (Paper Nos. 29 & 30, respectively, entered 2/1/05) rendered by Judge Locke on a previous motion for summary judgment brought by Siena, and on American Plumbing and Heating’s motion to dismiss. Both motions were denied.
*440 Judge Locke acknowledged the general proposition that Massachusetts will enforce a waiver of subrogation clause in a case of ordinary negligence, see Haemonetics Corp. v. Brophy & Phillip Co., 23 Mass.App.Ct. 254 (1986); Fortin v. Nebel Heating Corp., 12 Mass.App.Ct. 1006 (1981). He also noted, however, the general disfavor, on public policy grounds, of contract clauses that shield a party from claims for gross negligence, Zavras v. Capeway Rovers Motorcycle Club, 44 Mass.App.Ct. 17, 19-20 (1997), or responsibility for a statutory or a regulatory code violation. Henry v. Mansfield Beauty Academy, 353 Mass. 507, 511 (1968); Vallone v. Donna, 49 Mass.App.Ct. 330, 332 (2000). He observed that at the time, no reported Massachusetts case had considered the application of these public policy concerns to waiver of subrogation clauses (as opposed to outright exculpatory clauses), and also that in this case, both gross negligence and code violations are alleged. He held that the caselaw concerning exculpatory clauses is transferable to waiver-of-subrogation clauses, and so denied Siena’s summary judgment motion.
Finally, on American Plumbing and Heating’s motion to dismiss, Judge Locke held that General Conditions paragraph 11.5 is, where subcontractors are concerned, a one-way street: Siena is required to exact a waiver of subrogation from its subcontractors, but the clause says nothing about subcontractors being protected from sub-rogation claims by the owner’s insurer. See Fortin, 12 Mass.App.Ct. at 1007 (construing General Conditions language very close to that in this case, and holding that waiver did not bar claims against subcontractor).[3]
Since Judge Locke’s rulings in this case, there have been at least three trial court decisions in other cases which have considered the reach of subrogation waivers under Massachusetts law and public policy.
In Federal Ins. Co. v. Cogswell Sprinkler Co., Inc., No. 03-CV-10920-MEL, 2005 WL 4169716 (D.Mass. Feb. 15, 2005), Judge Lasker held, as had Judge Locke two weeks before, that a negligence claim premised on a code violation (there, a violation of National Fire Protection Association standards as incorporated by reference into the Massachusetts State Building Code) was not barred by a waiver of subrogation. “Public policy,” the court held, precludes [a defendant] from exculpating itself from liability for negligence in a task that affects public interest and safety." The court therefore denied summary judgment for the defendant contractor.
In Federal Ins. Co. v. CBT/Childs Bertman Tseckares, Inc., 2007 WL 1630687 (Mass.Super. 2007; Connolly, J.) [22 Mass. L. Rptr. 472], another judge of this Court agreed, and denied summary judgment to a contractor who was likewise alleged to have violated the NFPA standards as adopted by the State Building Code.
On September 14 of this year, however, in Great Northern Ins. Co. v. Architectural Environments, Inc., 05-CV-12356-NMG, Judge Gorton approved what he appropriately characterized as the “very lucid and carefully researched” recommendation by Magistrate Judge Dein, that comes out the other way. Judge Dein began by noting the usefulness of waivers of subrogation in encouraging the contracting parties to carry adequate insurance, and in reducing the disruptions and transaction costs associated with claims. Report and Recommendation at 47, citing (inter alia) Haemonetics, 23 Mass.App.Ct. at 258. She pointed out that unlike the true exculpatory clauses considered in the cases on which the Cogswell Sprinkler and CBT/Childs cases (as well as Judge Locke’s decision in this case) relied, waivers of subrogation do not prevent compensation to the injured party- Report and Recommendation at 48-50. She cited numerous cases from other jurisdictions on both sides of the issue, and was convinced by those cases which have held that the public policies served by waivers of subrogation, and the goal of honoring the intentions of the contracting parties, override any contrary public policy concerns. Id. at 51-55.
If this issue were being raised for the first time in this case, I would take a fresh look at it. It is a substantial question, unsettled by any Massachusetts appellate decision, and one which it appears likely— barring a settlement — will be addressed on appeal in this case, whatever I decide here.
Judge Locke’s decision is, however, the law of the case. That does not, of course, mean that it is written on stone tablets. “(T]he power to reconsider an issue remains in the court until final judgment,” and the reconsideration need not always be by the same judge as originally decided the issue. Riley v. Presnell, 409 Mass. 239, 242 (1991).
Nonetheless, “[a] judge should hesitate before undoing the work of another judge.” Barbosa v. Hopper Feeds, Inc., 404 Mass. 610, 622 (1989). In the situation before me, I find that the prudential considerations underlying the law of the case doctrine carry the day. Judge Locke’s decision was rendered almost three years ago. Since then, it is apparent, the parties have expended considerable sums in discovery, motion practice, and other preparation of the case. A final pretrial conference is scheduled for February 11, 2008, and the case will be tried in 2008. It will be submitted to a jury on special questions. The waiver of subrogation issue can be preserved adequately for appeal without undue disruption at trial; perhaps, with some creative lawyering, it could be preserved in the event of a settlement as well.
The claims are now over five years old; they would be two to three years older if the case had to be tried following an appeal from an allowance of these motions. Although the trial undoubtedly will be expensive for all concerned, the appellate process — were I to allow the motions — would be expensive as well, both financially and (if the case needed to be tried after all) in terms of faded memories, perhaps lost or deceased witnesses, and the other costs of delayed justice.
*441 The Motions for Summary Judgment of Defendants Arrowstreet, Inc. and AHA Consulting Engineers, Inc. (Paper #72) and of Siena Construction Corp., American Plumbing and Heating Corp., Minus Eleven, Inc., and Fred Williams, Inc. (Paper #67) are therefore ALLOWED IN PART and DENIED IN PART. AIC’s claims may proceed, but as against Siena, Arrowstreet, and AHA recovery shall be limited to damages arising from the defendant’s (a) gross negligence, or (b) negligence premised on a violation of statute or regulation.
C. Fred Williams, Inc.’s Motion for Summary Judgment — Scope of Work.
Defendant Fred Williams, Inc. (“FWI”) was the HVAC subcontractor on the project. The ductwork was installed by Qualify Air Metals, Inc., apparently a second-tier subcontractor under FWI. FWI’s separate Motion for Summary Judgment is premised on its assertion that its scope of work did not include providing ventilation to Cold Room 442, and it therefore cannot be held liable for the accumulation of natural gas therein.
The record evidence on this point may be summarized, in the light most favorable to AIC, as follows. There were to be five environmentally controlled laboratory facilities on the fourth floor of 320 Bent Street: two cold rooms (440 and 442) and three warm rooms (439, 444, and 446). These rooms were to be constructed by defendant Minus Eleven.
The claim against FWI concerns the ventilation system, which FWI was to supply and construct. A shop drawing, titled “4TH FLOOR DUCT LAYOUT’ and dated 2-10-02,[4] showed no ductwork leading to any of the five spaces originally laid out as environmentally controlled rooms. The drawing did show a supply duct and diffuser, and an exhaust duct and grille, serving Corridor 441, which led into Cold Room 442.
Wherever the drawing showed ductwork, Qualify Air Metals was to construct it as shown; then Siena or a subcontractor (perhaps Minus Eleven, but not FWI or Qualify Air Metals) was to do the “penetrations”— i.e., cut the holes in the ceiling, at locations determined by the architect and engineer, into which FWI (or, likely, its subcontractor Qualify Air Metals) would install the grilles and connect them to the ducts.
At some point, however, the plans changed. The space that had been Corridor 441 was added to Cold Room 442, whose shape now resembled a squared-off bottle, having the former corridor as its slightly off-center neck.
It seems reasonably clear that the merger of Corridor 441 into Cold Room 442 occurred before the Februaiy2002 shop drawing was prepared. That drawing still identifies the space served by the ductwork as Corridor 441. The entire bottle-shaped space is bounded, however, by a bold border of a style used elsewhere on the drawing only to delineate the environmentally controlled rooms. Resolving any ambiguity on this point in AIC’s favor, then, the drawing shows an enlarged Cold Room 442 which — unlike any of the other environmentally controlled rooms — was to be ventilated by duct-work installed by FWI by its subcontractor, Qualify Air Metals.
Thus, the Qualify Air Metals drawing shows an enlarged cold room serviced by ductwork supplied by FWI — albeit in an oddly dysfunctional location, with supply and exhaust huddled together near the top end of the bottleneck (i.e., the door to the enlarged Cold Room 442). Arrowstreet’s Rule 30(b)(6) designee, Howard Moreno, testified without contradiction that the ductwork to the former Corridor 441 should have been removed from the drawings at the time the corridor was merged into Cold Room 442. Leaving it there was a mistake, plain and simple.
Qualify Air Metals nonetheless constructed the ducts as shown on the drawing. When its sheet metal foreman, Mike Hurley, asked Siena’s Hank Mosca about the penetrations, Mosca told him either that there would be no penetrations, or that the locations would be determined later.[5] He directed Hurley to cap the ducts over the former Corridor 441. No one ever told FWI or Quality Air Metals to uncap the duct and connect it to the room, and FWI did not raise the issue outside the FWI/Qualify Air Metals/Siena circle.
Nor did FWI prepare a Request for Information (“RFI”), which is the manner in which conflicts or ambiguities in plans or other contract documents are addressed and resolved. An RFI ordinarily would be issued by the subcontractor within whose scope of work the conflict or ambiguify lay. It would go to Siena, who would forward it to the architect, who would resolve the issue and provide direction back down the chain of command.
FWTs Welch testified that he did not know that there was gas service to Cold Room 442,[6] and that had he known this, he would have raised the issue (i.e., of running gas into an unventilated room) with Mosca, and would have followed up with an RFI. In fact, the failure to ventilate Cold Room 442 was, because it was a laboratory intended for human occupancy and using natural gas, a code violation.[7]
The question remains, however: what (if anything) did FWI do wrong, and how (if at all) was its error a proximate cause of the accident?
FWI cannot be faulted for failing to do something that was not within its scope of work, even if its subcontractor mistakenly included it on a shop drawing.[8] By the time FWI installed the ductwork over it, the former Corridor 441 had been made part of Cold Room 442. No other environmentally controlled room is shown being ventilated by FWI/Qualify Air. From this fact and Moreno’s testimony that the drawing’s depiction of ductwork to 441 was a mistake, the inference is inescapable that whatever ventilation these rooms were to have would be supplied by the subcontractor(s) building the rooms and their associated systems, not by FWI. A contractual obligation *442 incurred by mutual mistake is no obligation at all. See, e.g., Mickelson v. Barnet, 390 Mass. 786, 791 (1984).
AIC is critical of FWI’s failure to submit an RFI, which — AIC argues — would have triggered an inquiry into why Cold Room 442 wasn’t being ventilated as shown on the Quality Air drawing, which would have resulted in ventilation being installed. It is plain from the undisputed evidence, however, that an RFI on this point would not have triggered much of an inquiry, since it would quickly have been discovered that the Quality Air drawing was mistaken on this point.
Given the clear evidence, before FWI at the time and now in the record, that the drawing was mistaken, it seems a stretch to say FWI was negligent for not submitting an RFI. Even assuming negligence, moreover, the lack of an RFI was not a proximate cause of the accident. The only likely resolution, had an RFI reached Arrowstreet concerning the ductwork over 441, would have been to correct the mistake on the shop drawing. The connection between addressing this small and understandable mistake on the drawing, and a discovery that no other provision had been made for proper ventilation of the environmentally controlled rooms (if this was true), is simply too conjectural and attenuated to amount to proximate cause. Cf. Glidden v. Maglio, 430 Mass. 694, 697-98 (2000) (plaintiffs theorized that if owner had obtained a required work permit, this would have prompted an inspection, detection, and correction of a defect in scaffolding; SJC holds that “(t]his conjecture is . . . insufficient to defeat summary judgment”); Glicklich v. Spievak, 16 Mass.App.Ct. 488, 492-93 (1983) (evidence that causal connection between negligence and damage “is possible, conceivable, or reasonable, without more, is insufficient to meet [AIC’s] burden” on causation).
FWI’s motion for summary judgment is therefore ALLOWED.
D. AIC’s Motion for Partial Summary Judgment Against Siena and APH.
AIC’s motion for summary judgment against Siena and its plumbing subcontractor, American Plumbing and Heating Corp. (“APH”), is based on an appealingly simple premise: the gas outlets APH installed in Cold Room 442 were required by code to be closed gas tight with a threaded cap or plug, immediately after installation. They were not so closed; this allowed a valve to be jarred open by someone after the gas service was connected; and that is how the gas entered the room.
The material facts are undisputed. The gas piping into Cold Room 442 terminated in “turret valves” — the faucet-like fixtures mounted on the laboratory benches and having the tapered, serrated nozzles that will be familiar to anyone who took a high-school chemistry course. The valves were not capped, plugged, or otherwise gas tight. Siena and APH concede, for present purposes at least, that the explosion probably resulted from one of these turret valves having been opened, allowing natural gas to accumulate in the room.
The operative code is the National Fuel Gas Code, NFPA-54-2002, which the Massachusetts Board of State Examiners of Gas Fitters and Plumbers has adopted as its own. 248 CMR 4.03. Section 3.8.2 of the Code reads as follows:
3.8.2. Cap All Outlets.
(a) Each outlet, including a valve or cock outlet, shall be closed gas tight with a threaded plug or cap immediately after installation and shall be left closed until the gas utilization equipment is connected thereto. When the equipment is disconnected from an outlet and the outlet is not to be used again immediately, it shall be closed gas tight.
Outlets shall not be closed with tin caps, wooden plugs, corks, or by any improvised methods.

Exception No. 1: Laboratory equipment installed in accordance with 5.5.2(a).

Exception No. 2: The use of a quick-disconnect device with integral shutoff or listed gas convenience outlet shall be permitted.![9]]
Section 5.5.2(a), referenced in Exception No. I, reads as follows:
5.5.2 Use of Gas Hose Connectors: Listed gas hose connectors shall be used in accordance with the terms of their listing as follows:
a. Indoor: Indoor gas hose connectors may be used with laboratory, shop or ironing equipment that requires mobilily during operation. A shutoff valve shall be installed where the connector is attached to the building piping. The connector shall be of minimum length but shall not exceed 6 feet. The connector shall not be concealed and shall not extend from one room to another nor pass through wall partitions, ceilings, or floors.
Finally, The Fuel Gas Code elsewhere contains the following definitions, among many others:[10]
APPLIANCE (EQUIPMENT). Any apparatus or equipment that utilizes gas as a fuel or raw material to produce light, heat, power, refrigeration, or air conditioning.
**:): *
GAS UTILIZATION EQUIPMENT. An appliance that utilizes gas as a fuel or raw material or both.
The parties’ experts differ on the proper application of the code to gas valves mounted on laboratoiy benches. Mark Hemingway, an engineer retained by AIC, avers by affidavit that in his opinion, the installation of uncapped, unplugged turret valves without gas utilization equipment attached violated the section 3.8.2 of the fuel gas code. The serrated nozzle on each of the valves installed in Cold Room 442 is removable. Its sole purpose is to accommodate a gas hose connector which would then be connected to a piece of gas utilization equipment (meaning, I infer, that the valve and nozzle are not themselves to be considered “gas utilization equipment”). If the nozzle is unscrewed from the valve, it can be *443 replaced with a plug of the same diameter and thread, producing a gas light closure. Such a plug may be purchased at a hardware store for less than two dollars. Alternatively, Hemingway says, Siena and APH could have complied with the code by connecting the nozzles to laboratory gas utilization equipment that required mobilily during operation.
AIC also has submitted an affidavit by Patrick Kimener, Vice President for Sales of the Chicago Faucet Company, which evidently made the valves installed in Cold Room 442. He states that the only proper use of the nozzle is to attach it to a hose and thereby connect it to a piece of gas utilization equipment; it is not designed to transmit gas directly into the atmosphere of any space, or to be ignited directly. He backs Hemingway’s assertion that code compliance can be achieved by use of an inexpensive and readily available plug, or by attaching gas utilization equipment immediately upon installing the valve.
Siena and APH have submitted affidavits and deposition testimony from several witnesses on the issue of code compliance. Three master plumbers (Richen-burg, Kelleher, and DiCienzo) agree that the gas installation in Cold Room 442 complied with applicable codes; that the Chicago Faucet valves are not intended to be capped, and Chicago Faucet in fact does not sell caps for them; and that plugging the turret valves would make them unusable, because bylaw, a master plumber would have to remove and replace the plug every time the user wished to connect or disconnect a piece of equipment. A consulting engineer (Remmer) chimes in that the contractors were required to, and did, install the gas plumbing in accordance with the construction documents, and that this installation fit within the 5.5.2(a) exception. An NStar representative (Brogan) says (albeit unhelpfully, because without reference to any identified code or standard) that he doesn’t think the turret valves had to be capped.
It is permissible for an expert to give an opinion as to the meaning of a term of art that is used, but not defined, in a regulation. Perry v. Salem Hous. Auth., 61 Mass.App.Ct. 1125 (2004) (Rule 1:28 decision), citing Roberts v. Department of Envtl. Quality Engr., 404 Mass. 795, 799 (1989). Otherwise, “[interpretation of administrative regulations is a matter of law to be decided by the court.” Toubiana v. Priestly, 402 Mass. 84, 90 (1988), citing Corsetti v. Stone Co., 396 Mass. 1, 12 (1985).
In this case it is clear — and I rule, as a matter of law — that APH’s installation of uncapped turret valves did not violate section 3.8.2 of the fuel gas code, because the installation was within Exception No. 2 (i.e., was within section 5.5.2(a) of the code).
In so holding, I accept the proposition that the turret valves were not themselves “gas utilization equipment.” One would not, as Kimener sensibly points out, light gas where it comes out of the valve. One would, attach a hose to it and run the hose to, say, a Bunsen burner. It is the burner that “utilizes gas as a fuel. . . ,” not the valve. The valve is but the end-piece of the gas line and, as such, was required to be gas tight unless it fit within one of the exceptions to section 3.8.2.
The turret valves do, however, fit squarely within Exception No. 1. A flexible gas hose pushed firmly onto the serrated nozzle and attached, at the other end, to a Bunsen burner would be a typical and very common example of an “(i)ndoor gas hose connector! 1 ■ • • used with laboratory . . . equipment that requires mobility during operation,” with the turret valve serving as the required “shutoff valve ... installed where the connector is attached to the building piping.” (Fuel gas code section 5.5.2(a).) According to the plain language of the code, therefore, the installation was, in this aspect at least, in compliance.
Hemingway’s contrary interpretation does not turn on the meaning of technical terms (except in making the point that the turrets are not gas utilization equipment, with which I agree, based on the code’s clear definition of the term). Rather, his application of section 5.5.2 intrudes on the Court’s function of interpreting the regulation as a matter of law, and is erroneous in light of the regulation’s plain and unambiguous language
Hemingway’s and AIC’s interpretation also fits poorly with the real-world facts. I notice, judicially, that the fuel gas code is a national code, adopted in 37 states from Maine to Hawaii (including Illinois).[11] If every installation of a Chicago Faucets turret valve in any of these states required a plug or a cap, one might think that such an indispensable item would be supplied with the valve. Instead, gasfitters are left to hope that the local hardware store carries them, and that the apprentice can be trusted to bring back a plug of the correct size and thread.
Once installation is complete and the lab is in use, one could not expect technicians to call a master plumber every time a piece of lab equipment is to be connected or disconnected to the gas supply. Even if the testifying master plumbers are wrong, and a lab technician may do this on his or her own, one may predict with some confidence that the plugs would be seldom used, and lost within weeks.[12]
For all of these reasons I rule, for purposes of this Motion and for trial (see Mass.R.Civ.P. 56(d)) that Exception No. 1 and section 5.5.2(a) applies, on its face, to the installation at issue here, and that Siena and APH therefore complied with section 3.8.2 of the fuel gas code, as adopted by 248 CMR 4.03. AIC’s motion for summary judgment against Siena and APH is therefore DENIED.
ORDER
For the foregoing reasons:
1. The Motions for Summary Judgment of Defendants Arrowstreet, Inc. and AHA Consulting Engineers, Inc. (Paper #72) and of Siena Construction Corp., American Plumbing and Heating Corp., Minus *444 Eleven, Inc., and Fred Williams, Inc. (Paper #67) are ALLOWED IN PART and DENIED IN PART. AIC’s claims may proceed, but as against Siena, Arrowstreet, and AHA recovery shall be limited to damages arising from the defendant’s (a) gross negligence, or (b) violation of statute or regulation.
2. The separate Motion for Summary Judgment of Fred Williams, Inc. (Paper #75) is ALLOWED, and all claims against FWI are dismissed.
3. AIC’s motion for summary judgment against Siena and APH (Paper #68) is DENIED. It is further determined that the installation of the gas turrets in Cold Room 442 complied with section 3.8.2 of the fuel gas code, as adopted by 248 CMR 4.03.

In the Agreement Between Owner and Architect, the reciprocal waiver extends to claims against “the contractors, consultants, agents and employees” of the other party; hence, AHA (Arrowstreet’s consulting engineer) is protected to the same extent as Arrowstreet.

General Conditions section 11.5 provides that Siena is to “require similar waivers by Subcontractors,” but does not expressly entitle subcontractors to the benefit of the Owner’s waiver of subrogation.

Judge Locke’s conclusion as to the status of the subcontractors seems ineluctable in light of the contract language, which is from the same (now outdated) AIA form considered in the Fortin case.
The subcontractors’ reference in the current motion to an amendatory endorsement (denominated “CG 24 04”), in which the insurer waives subrogation rights against the general contractor and all tiers of subcontractors, might do the job if it pertained to the right insurer and the right policy. CG 24 04 s is an endorsement to an Owner Controlled Insurance Policy issued by American Protection Insurance Company, one of the Kemper family of companies. This is not the policy under which AIC (one of the Fireman’s Fund family of companies) made the loss payment that entitles it to subrogation. The waiver by Kemper (which evidently is defending Siena and the subcontractors as additional insureds) is not, in other words, a waiver by AIC, and is irrelevant to the issues raised by this Motion.
In contrast to the General Conditions to the construction contract, section 1.3.7.4 of the Agreement Between Owner and Architect does expressly extend to both parties’ contractors and consultants. AHA, as Arrowstreet’s consulting engineer, is therefore protected to the same extent as is Arrowstreet.

The drawing was prepared by Quality Air Metals. It was reviewed by Siena for compliance with the contract documents, and approved.

The former was Mosca’s recollection; the latter, the understanding of FWI’s William Welch.

The plumbing plans — part of the contract documents— showed this, but FWI would not have looked at them as its scope of work did not include plumbing.

The State Building Code provides, at 780 CMR 1205.2 and 3603.6.2, that “(ejveiy room or space intended for human occupancy shall be provided with natural or mechanical ventilation,” defined (at section 1202.1) as “(t]he natural or mechanical process of supplying conditioned or unconditioned air to, or removing such air from, any space.”
AIC additionally argues that failure to ventilate a laboratory space in which natural gas was to be used, was a Code violation separate and apart from the aforementioned sections 1205.2 and 3603.6.2 of the State Building Code pertaining to rooms intended for human occupancy. The proposition seems entirely plausible on its face (especially with the benefit of hindsight, but even with mere foresight), though the regulatory analysis is a tortured one.
427 CMR (the code of the Board of Fire Prevention) provides, at 10.03(6), that “(ojpen flame devices and special food service devices shall comply with the requirements of NFPA [National Fire Protection Association] 101.” Section 10.28 provides, “Documents or portions thereof that are referenced within 527 CMR 10.00 shall be considered a part of the requirements of 527 CMR 10.00,” and refers the reader to section 49.00 for a complete listing of all documents so referenced. At section 49.00, one learns that NFPA 101 (1994 edition) — NFPA’s Life Safety code — is referenced only once in all of Title 527, at the aforementioned section 10.03(6), pertaining to open flame devices and special food service devices.
Apart from its provisions for open flame and special food service devices, NFPA 101 requires (at section 6-4.4) that laboratories that use chemicals comply with NFPA-45, 1991 edition. This specifies that in laboratory buildings, units and work areas in which hazardous chemicals (including chemicals with a flammability rating of 3 or 4) are stored or handled, air shall be continuously discharged. Natural gas has a flammability rating of 4. In short, the argument goes, because Cold Room 442 was to be a laboratory in which natural gas would be used, it was required to have active mechanical ventilation under NFPA 101, and therefore under 527 CFR (because that title references, once on an unrelated subject, NFPA 101).
It is not entirely clear to me that 527 CFR 10.28’s catch-all is intended to sweep quite as broadly as AIC suggests. On the other hand, the basic point — that a laboratory using natural gas ought to be ventilated — seems obvious enough. It is also plain that the CMR required that Cold Room 442 be ventilated, because it would be occupied by humans, and that the ventilation had to be mechanical, both because the room was an interior space that could not be naturally ventilated to comply with (a) and also because open flame devices would be used therein. In other words: I accept AIC’s argument that the failure to ventilate Cold Room 442 was a violation of the CMR.

Arrowstreet may have reviewed the drawing, see General Conditions to the Contract for Construction secs. 2.1.3 & 4.12.9, though the copy in the record shows only that Siena reviewed and approved it.

It is undisputed that the turret valves did not have quick-connect devices with integral shutoff, and that Exception No. 2 therefore does not apply.

The NFPA has since issued a revision of the Fuel Gas Code, NFPA-54-2006. There, the definitions of “appliance” and “equipment” were revised, and that for “gas utilization equipment” discontinued entirely. The CMR, however, still references the 2002 Code.

See http://www.nfpa.org/assets/im-ages/NFPA5 4AdoptionMap.gif.

The second suggestion offered up by Hemingway and Kimener — that in lieu of plugs or caps, laboratory equipment should be hooked up as soon as the valves are installed — is even more absurd. One would not expect the building owner to supply Bunsen burners with the space, or the plumbing contractor to coordinate this with the future tenant (which may, until move-in, be using its burners elsewhere, as Micro-bia was (Murphy aff., ¶5)). Finally, this procedure would add nothing from the standpoint of safety since gas utilization equipment, by definition, uses gas; unlike a plug or cap, it cannot be “gas tight,” any more than the turret valve itself is.