Doerfer, J.
Plaintiffs bring this action for legal malpractice alleging that the defendants negligently caused Ms. Barbara Attridge Schell (“Ms. Schell”), who was acting as executrix of the estate of Walter R. Attridge, Jr. (“Mr. Attridge”), to accept a settlement in an underlying medical malpractice case which was far below the settlement value of the case. The plaintiffs further allege that, as a result of said negligence, each were injured. This action is currently before the court on various motions for summary judgment filed by defendants Gregory H. Arabian (“Arabian”), Paul J. Giancola (“Giancola”) and Langan, Grossman, Kinney & Dwyer, P.C. (“Langan Grossman”). (The moving defendants will be referred to as the defendants.) For the reasons outlined below, defendant Langan Grossman’s motion for summary judgment is ALLOWED. Defendants Arabian and Giancola’s motions are ALLOWED in part and DENIED in part as detailed below. The other rulings of the court herein will govern the future proceedings in this case. Mass.R.Civ.P. 56(d).
BACKGROUND
The following facts appear from the affidavits, depositions and admitted pleadings filed in this matter. Where necessary, inferences most favorable to the plaintiffs are drawn in order to test the defendants’ motions for summary judgment.
In July of 1981, Mr. Attridge was found to have what was believed to be an operable lesion on his left lung. Mr. Attridge was referred to Dr. John J. Collins, Jr. (“Dr. Collins”), a thoracic surgeon at the Brigham and Women’s Hospital (the “hospital”). On July 15, 1981 a “left pneumonectomy,” the removal of the left lung, was performed on Mr. Attridge. Approximately two weeks later, onAugust3,1981, Mr. Attridge died at the hospital.
In short, it is alleged that certain tubes carrying oxygen were removed from Mr. Attridge too soon (the “extubation") and replaced too late (the “reintubation”). Additionally, the plaintiffs allege that Dr. Collins failed to properly assess the dangers of the operation prior to performing the surgeiy[1] and failed to leave proper instructions concerning Mr. Attridge’s post-operative care.
The records support a conclusion that Dr. Collins left the hospital soon after completing the surgery. Dr. Collins apparently left no instructions for the hospital staff concerning a possible extubation.
Mr. Attridge was taken from the operating room to the hospital’s intensive care unit. At approximately 2:00 a.m., Mr. Attridge’s blood gasses were measured. It appears, however, that a number of other tests routinely used to assess the appropriateness of an extubation were not performed.[2] Despite this apparent lack of data, the decision was made to extubate Mr. Attridge. There is no indication whatsoever as to who ordered the extubation or why the extubation was ordered without the additional tests being performed.[3] Additionally, there is no indication as to who performed this procedure. These doctor(s), who are as of yet still unidentified, are referred to hereinafter, as the “phantom doctors.” Although, as Dr. Collins noted in deposition testimony, that “the house staff was expected to see to it that adequate documentation for changes in the clinical condition of Mr. Attridge appeared in the chart” (Collins Deposition at 43.), no such documentation was made.
At approximately 2:30 a.m., Mr. Attridge was ex-tubated. His blood gasses were again measured at approximately 3:00 a.m. This test indicated that Mr. Attridge’s condition was deteriorating. Despite these results, no action was taken at this time. At approximately 4:00 a.m., Mr. Attridge went into severe respiratory distress and was reported a “Code Blue.” An emergency reintubation was then performed.[4] A number of the plaintiffs medical experts have opined that Mr. Attridge’s death was the direct result of this incident.
Mr. Attridge was survived by his wife, Ms. Schell.[5] Ms. Schell was the executrix of Mr. Attridge’s estate. Mr. Attridge was also survived by two daughters from a previous marriage, Cynthia Attridge Farrow and Lisbeth Attridge Seibert (referred to, collectively, as the “daughters”).
In January of 1982, Ms. Schell contacted Irwin Birnbaum (“Birnbaum”) an attorney with the Syracuse, New York law firm Birnbaum, Manaker & Aquilio, P.C. (“Birnbaum Manaker”).[6] Ms. Schell subsequently retained the firm to handle her husband’s *93 medical malpractice action.[7] At the time Ms. Schell retained Birnbaum Manaker, Giancola was working as an associate for the firm. It appears from the records that, from sometime in 1983 forward, Birnbaum was the partner assigned to the Schell case and Giancola was the associate assigned to the case. Giancola worked on the case until 1986 when he left the firm to move to Arizona.
In April of 1983, Birnbaum Manaker retained attorney Gregory H. Arabian as local Boston counsel. The parties dispute the extent of Arabian’s expected involvement in the case. It is clear, at very least, that Arabian was expected to advise the Syracuse lawyers concerning local procedure and to file pleadings as instructed by Birnbaum Manaker.
In May of 1984, a complaint was filed in Suffolk Superior Court on behalf of Ms. Schell.[8] Only Dr. Collins and the hospital were named as defendants in the action. Both Birnbaum and Arabian personally signed the complaint which sought damages in the amount of $8 million.
In July of 1984 an answer was filed by attorney Craig M. Brown (“Brown”) of Melick & Porter on behalf of Dr. Collins and the hospital. The seventh defense of the answer read:
And further answering, the defendants [sic] says that the Brigham and Women’s Hospital is a public charily, and therefore under M.G.L. Chapter 231, Section 85K, the plaintiffs recovery is barred or limited according to applicable statutes and case law.
Also in July of 1984, a second complaint was filed on behalf of Ms. Schell, this time in the U.S. District Court for the District of Massachusetts. Jurisdiction for the Federal Court was based on diversity. The parties hotly contest how the decision to proceed in Federal Court came about. The plaintiffs allege that the defendants were “steered” to Federal Court by Dr. Collins and the hospital. The defendants deny this characterization and insist, instead, that they chose to move the action to Federal Court for tactical reasons. The implications of these arguments are discussed more fully below. In any event, the federal complaint was again signed by both Birnbaum and Arabian. Again, an answer was filed by Brown on behalf of Dr. Collins and the hospital. The answer again asserted an identical charitable immunity defense on behalf of the hospital (eighth defense). Later in July, upon motion by Arabian, both Birnbaum and Giancola were admitted, pro haec vice, as trial counsel in the case.
In February of 1985, the state court action was dismissed so as to allow the federal action to proceed.[9] On February 9, 1985, the plaintiffs moved for a medical malpractice tribunal to be convened and, on March 5, 1985, the federal magistrate who was handling pretrial matters indicated that the case should be referred back to the state court for a medical malpractice tribunal.[10]
During this period of time (1983-1986), Giancola frequently wrote to Ms. Schell to update her on the status of the case.[11] It also appears that Ms. Schell would occasionally call Birnbaum for updates. Giancola also corresponded with Arabian to discuss the status of the case. Also during this period of time, Giancola and other attorneys at Birnbaum Manaker wrote to a number of physician experts to obtain opinions concerning Dr. Collins’s alleged malpractice.
One of the first expert opinions came from Dr. Marcelle E. Willock (“Dr. Willock”) of University Hospital in Boston. On July 6, 1983, Dr. Willock wrote to Birnbaum expressing the opinion that Dr. Collins had deviated from the normal standard of care in both his pre-operative and post-operative care. Specifically, Dr. Willock criticized Dr. Collins for failing to perform certain tests prior to performing the surgical procedure. Dr. Willock’s letter was also critical of Dr. Collins for failing to leave proper instructions for the hospital staff for Mr. Attridge’s post-operative care: “There is no mention of the criteria used to discontinue mechanical ventilation. How was he monitored in the ICU? Orders say ‘per ICU Team.’ ” Willock Letter at 1, Exhibits Submitted in Support of Plaintiffs’ Opposition to Defendant Arabian’s Motion for Summary Judgment, Exhibit K-(I). Finally, Dr. Willock’s letter questioned the actions of the phantom doctors: “Who decided to exhíbate him . . . and what criteria were used? The chart does not reflect if any of the recommended parameters were measured and if the patient fulfilled them.” Id. at 2.
In August of 1983, Lucy Henson, another Birnbaum Manaker attorney met with Dr. Stuart Battle of Maryland. According to Henson, Battle found it “most difficult to pinpoint where negligence had occurred . . . [h]owever, he also stated T smell a fish.’ ” Id. at Exhibit K(2). Battle apparently noted that Attridge’s death might have been unavoidable but, upon later consideration, Dr. Battle wrote:
This was not simply a case of unavoidable [complications] . . . but undertreated and neglected problems. A question that I have is where were the doctors? The progress notes do not reflect that they were really attending this man. Another question that I have is to whom did Dr. Collins sign out (since he apparently went on vacation)?[12] Was it another board certified thoracic surgeon? If so, where are notes by him?
Id. at Exhibit K(3). In that same letter, Dr. Battle went on to agree with Dr. Willock’s conclusion that there had been malpractice in Mr. Attridge’s pre- and post-operative care. Dr. Battle, too faulted the lack of pre-operative tests and the timing of the extubation and reintubation.
It appears that two more doctors were contacted for expert opinions (Drs. Togut and Mathias), both of whom came to essentially similar conclusions. Both of these physicians also remarked that the records were insufficient to identify the phantom doctors who had performed the extubation and reintubation.
Dr. Mathias was especially critical of the actions of the phantom doctors:
*94 At 2:30 a.m. on 7/16, the patient was extubated. He was described by the nurses at this time as combative. There is no extubation order, and there are none of the usual studies that one uses in order to decide to extubate a patient. These studies include a postoperative chest X-ray, tidal volume, vital capacity and negative inspiratory force. To my knowledge from the reading of the chart, tidal volume, vital capacity and negative inspiratory force were not done by the respiratory therapist. In addition, although a chest X-ray was taken, there is no documentation in the chart that it was seen by a physician. I would like to comment that extubating a patient after a pneumonectomy, which is a very radical operation, at 2:00 a.m., and without benefit of these tests, is not standard medical practice; and I found this highly unusual.
Id. at K(8).
The defendants had secured all of these opinions prior to the tribunal’s hearing.[13] Little occurred of note between March 5, 1984 and February of 1986 when the medical malpractice tribunal was finally scheduled. Correspondence between Arabian, Giancola and Birnbaum during this period of time indicated that Giancola and Birnbaum wanted to take depositions prior to the tribunal hearing. Arabian responded to these letters by saying:
[o]f course, that is a good idea and I am all for it. Unfortunately, in this archaic Commonwealth of Massachusetts, very little by way of innovation of this sort is allowed ... I do not think . . . that you will be very successful in obtaining any discovery before the tribunal, and would caution you against excessive expectations in this regard.
Letter of November 23, 1984, Exhibits Submitted in Support of Plaintiffs’ Opposition to Defendant Arabian’s Motion for Summary Judgment, Exhibit H. In another letter, Arabian wrote:
As to depositions, I frankly feel you will be barking up the wrong tree if you feel [depositions are allowed as a matter of course prior to the [tjribunal. My experience (admittedly limited) has been, and my understanding is that discovery is rarely allowed prior to the [t]ribunal hearing . . . That doesn’t mean, of course, that you can’t try . . .
Letter of November 18, 1984, Id. None of the defendants ever moved for discovery. The plaintiffs allege that this failure to move for discovery was key in the defendants’ failure to identify the phantom doctors. Additionally, the plaintiffs have alleged that the defendants failed to properly follow up on the concerns of all of their expert witnesses that the records did not reflect what instructions, if any, Dr. Collins had left for the hospital staff and who, if anyone, was responsible for Mr. Attridge’s care in Dr. Collins’s absence.[14]
OnFebruary 26,1986, a medical malpractice tribunal was convened. The tribunal found that sufficient evidence had been produced to proceed against the hospital without the necessity of a bond but that sufficient evidence had not been produced with respect to Dr. Collins to proceed without a bond. One possible inference to be drawn from this finding is that the tribunal concluded that there was a sufficient offer of proof that Mr. Attridge’s death was indeed the result of medical malpractice, but that Ms. Schell had failed to provide sufficient evidence concerning Dr. Collins’s personal liability.
In March of 1986, Birnbaum and Giancola recommended to Ms. Schell that she not post the bond to proceed against Dr. Collins. The reasons given by the parties for this decision are numerous and varied. Giancola cites Dr. Collins’s reputation as a surgeon and Mr. Attridge’s poor health. A letter from Giancola also indicates that he was under the mistaken impression that the findings of the tribunal could be read to a jury. Giancola has implied that it was Arabian who led him to this incorrect belief. Additionally, numerous documents and affidavits reflect Birnbaum and Arabian’s interpretation that a negative tribunal finding meant that the case against Dr. Collins was not meritorious. It is clear that Birnbaum and Arabian communicated this belief to Ms. Schell.
In addition, Ms. Schell’s deposition testimony seems to indicate that Birnbaum told her it was easier to proceed against just one party so the action would be less confusing. It is undisputed that, prior to deciding not to post a bond, Ms. Schell was never informed of Massachusetts charitable immunity statute which would limit her recovery against the hospital to $20,000. Moreover, it is painfully clear from the events which followed that the defendants — at least Birnbaum and Giancola — were completely ignorant of this statute despite the defendants’ two answers which had specifically raised charitable immunity as a defense. Ms. Schell went along with her attorneys’ suggestion that Dr. Collins be dropped from the suit.
In April of 1986, Giancola sent out deposition notices to a number of parties including Dr. Collins. On May 23, 1986, Giancola left Birnbaum Manaker and moved to Arizona. On June 17, 1986, Dr. Collins was dismissed from the lawsuit.
In August of 1986, Birnbaum left his firm to join the firm of Langan, Grossman, Kinney & Dwyer, P.C. (“Langan Grossman”). Birnbaum’s exact status at the new firm is both unclear and somewhat immaterial. Birnbaum did, however, bring a number of cases with him to Langan Grossman including Ms. Schell’s case. The agreement with Langan Grossman concerning Birnbaum’s cases was that Langan Grossman would pay for any future costs incurred in pursuing the cases and Langan Grossman would be entitled, as a firm, to Birnbaum’s share of the contingency fee.
In May of 1987, Birnbaum and Langan Grossman parted ways. Birnbaum left the firm and formed Birnbaum & Rojas, P.C. Birnbaum took the Schell *95 case with him when he left Langan Grossman. The case progressed slowly towards trial and, in September of 1989, was finally set to be tried in front of U.S. District Court Judge Robert Keeton. Late in September, however, the hospital informed Birnbaum that it would pay its $20,000 maximum and, therefore, would not go to trial. Having realized, apparently for the first time, the import of Massachusetts’s charitable immunity law, Birnbaum attempted, in a phone conference with Judge Keeton and the hospital’s attorney, to amend his complaint to add additional defendants. Judge Keeton expressed his doubt that Massachusetts or federal law would allow such a late amendment, but suggested that Birnbaum file a written motion. No such motion was filed and, on September 27, 1989, the case was settled for $20,000.
DISCUSSION
Summary judgment shall be granted where there are no genuine issues as to any material fact in dispute and where the moving party is entitled to judgment as a matter of law. Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Community Nat’l Bank v. Dawes, 369 Mass. 550, 553 (1976); Mass.RCiv.R 56(c). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue, “and [further,] that the moving party is entitled to judgment as a matter of law.” Pederson v. Time, Inc., 404 Mass. 14, 17 (1989). “A complete failure of proof concerning an essential element of the non-moving party’s case renders all other facts immaterial” and mandates summary judgment in favor of the moving party. Kourouvacilis v. GenerctLMotors Corp., 410 Mass. 706, 711 (1991) (citing Celotexv. Catrett, 477 U.S. 317, 322 (1986)).
In the present case, there are, potentially, six acts or omissions claimed by plaintiffs as a basis for subjecting some or all of the them to liability for legal malpractice. These are:
1. the decision to file the action in federal court;
2. the failure to request discovery and/or conduct a full investigation prior to the medical malpractice tribunal;
3. the failure to identify and pursue claims against the “phantom doctors”;
4. the failure to pursue Collins/advising Schell not to post a bond to pursue Collins;
5. the failure to know/research Massachusetts’s charitable immunity law; and
6. the failure to notify/advise the decedent’s daughters, Farrow and Seibert, of their rights under the wrongful death statute.
To a certain extent, some of the issues involved in each of the alleged acts and omissions are common to all of the defendants. Where this is the case, the court will first address the issue as it applies to all of the defendants. However, since many of the defendants were involved in the underlying case at different points in time, there are factual differences in the analysis of potential liability. Where this is the case, the court will, after addressing issues common to all defendants, address the issues as they apply to the individual defendants.
Overriding Principles
The court begins by outlining a number of general principles which will guide this case.
Legal Malpractice
An attorney may be held liable for legal malpractice only if the plaintiff can show that the plaintiff “probably would have obtained a better result had the attorney exercised adequate skill and care.” Jernigan v. Giard, 398 Mass. 721, 723 (1986) (quoting Fishman v. Brooks, 396 Mass. 643, 647 (1986)). See also, Pattison v. Labor Relations Commission, 30 Mass.App.Ct. 9, 20 (1991) (plaintiff must show that “but for the malpractice, the plaintiff would have succeeded in the action against the third person”). The plaintiff need not show that the attorney failed to recover any amount in the underlying action, but may instead show malpractice by proving that the attorney settled the case for too low a sum. Fishman v. Brooks, supra, at 647, n. 1. (“A plaintiff whose case was settled too low because of his attorney’s negligence lost a valuable right, the opportunity to settle the case for a reasonable amount without a trial. See Drury v. Butler, 171 Mass. 171, 175 (1898)”). “The typical case of malpractice liability for an inadequate settlement involves an attorney, who having failed to prepare his case properly or lacking the ability to handle the case through trial (or both), causes his client to accept a settlement not reasonable in the circumstances.” Id. at 646.
Because the plaintiff must first show that he or she probably would have obtained a better result had the attorney exercised adequate skill and care, the plaintiff must, in essence, first try the underlying case in what is called a “trial within a trial.” Id. at 647. In determining whether or not the attorney was negligent in the underlying action, “some allowance must always be made for the imperfection of human judgment.” Colucci v. Rosen, Goldberg. Slavet, Levenson&Wekstein, 25 MassApp.Ct. 101, 111 (1987). Even so, “an attorney is not immune from liability for the consequences of a negligent exercise of professional judgment.” Fishman at 648.
The determination of the attorney’s negligence and the consequences of that negligence are normally issues to be determined by a jury. Id. at 647. Of course, even in situations normally reserved for a jury, “[t]here must be some indication that [the plaintiff] can produce the requisite quantum of evidence to enable him to reach the jury with his [or her] claims.” National Association of Government Employees, Inc. v. Central Broadcasting Co., 379 Mass. 220, 221 (1979) (quoting Hahn v. Sargent, 523 F.2d 461, 469 (1st Cir. 1975), cert, denied, 425 U.S. 904 (1976)).
In the present case, the defendants have all moved for summary judgment arguing that the plaintiffs will *96 be unable to prove at trial that, but for the defendants’ negligence, they would have been more successful in the underlying action. There are, potentially, two different underlying actions (or at least two portions of one action) which the court must address: the underlying action against Dr. Collins, and the underlying action(s) against the “phantom doctors.” As the court addresses the issue of the phantom doctors in depth below, it will not do so here.
With respect to the underlying action against Dr. Collins, the plaintiffs have produced expert medical testimony that Dr. Collins was negligent in the care he provided to Mr. Attridge and/or his supervision of care provided to Mr. Attridge and that this negligence was the proximate cause of Mr. Attridge’s death. Specifically, the plaintiffs have alleged that Dr. Collins was negligent in his failure to conduct certain preoperative tests and in his failure to leave proper instructions concerning Mr. Attridge’s post-operative care.
The defendants have, of course, argued that the case against Dr. Collins was weak. The defendants point to Mr. Attridge’s poor health, Dr. Collins’s reputation as a first-rate surgeon, and the finding of the medical malpractice tribunal that the offer of proof was insufficient with respect to Dr. Collins.[15]
At best, the evidence on this point is conflicting. The defendants may indeed be correct — the case against Dr. Collins may have been a difficult one. However, the plaintiffs have — at this stage — provided expert testimony concerning Dr. Collins’s negligence which, if believed, would allow a factfinder to conclude that Dr. Collins’s negligence was a substantial factor in Mr. Attridge’s death. Additionally, the defendants’ failure to pursue Dr. Collins (and their advising Ms. Schell not to post a bond to so proceed) can only be explained by virtue of the defendants’ ignorance of Massachusetts charitable immunity law. It may be that, in New York, the standard procedure in a medical practice action is to pursue the hospital (which has the deep pockets) and let the hospital expend its resources to bring the individual doctors into the action. In states where charitable immunity has been abolished, this is a reasonable enough course of action to pursue. In Massachusetts, however, it is not.[16]
What emerges then from the voluminous and conflicting records is a genuine issue of material fact best left to the jury. See, Delicata v. Bourlesses, 9 Mass.App.Ct 713, 719 (1980) (“The element of causation [in a medical malpractice case] presents a question of fact for the jury”).
Causation
Defendants Giancola and Arabian have both moved for summary judgment arguing that the plaintiffs will be unable to show that “but for” their negligence, the plaintiffs would have recovered more than they did in the underlying action. Essentially, each argues that, even if there had been negligence on their part, the failure of all of the subsequent attorneys to correct said mistakes was an intervening and superseding wrong precluding their being held liable. The court does not agree.
The defendants here have confused the “but for” causation — under which the plaintiffs will have to show that “but for” the defendants’ negligence the plaintiffs would have recovered more than they did— with the “substantial factor” test which will apply to the actions of each defendant individually. In O’Connor v. Raymark Industries, Inc., 401 Mass. 586 (1988), the court stated:
We have said before, and we repeat, “that if two or more wrongdoers negligently contribute to the personal injury of another by their several acts, which operate concurrently, so that in effect the damages are inseparable, they are jointly and severally liable.”
Id. at 591 (and cases cited therein). See also, Delicata v. Bourlesses, 9 Mass.App.Ct. 713, 720 (1980) (“[A] particular tortfeasor would not be relieved of liability for the entire harm she has caused just because another’s negligence might also be a factor in effecting the injury. The established rule is that an injured party is permitted to sue a tortfeasor for the full amount of damages for an indivisible injury that the tortfeasor’s negligence was a substantial factor in causing . . .”). Both the O’Connor court and the Delicata court rejected a “but for” test in favor of a “substantial factor” test with respect to each individual defendant’s negligence. O’Connor at 591; Delicata at 719-20.
The cases and commentary on this subject also support the conclusion that a tortfeasor can be held liable “for the foreseeable intervening conduct of a third party whether that conduct is negligent or not.” Jones v. Cincinnati, Inc., 32 Mass.App.Ct. 365, 369 (1992) (and cases cited therein). It follows, then, that “[i]f the tortious conduct of each of two or more persons is a legal cause of harm that cannot be apportioned, each is subject to liability for the entire harm, irrespective of whether the their conduct is concurring or consecutive.” Restatement (Second) of Torts, §879. See, also, Welch v. Keene Corp., 31 Mass.App.Ct. 157, 162 (1991) (applying substantial factor test to multiple defendants whose successive conduct led to the plaintiffs injuiy); Burke v. Hodge, 217 Mass. 182 (1914).[17] “Only unusual, extraordinary negligence of a third party will excuse an original tortfeasor’s liability.” Jones, supra, at 370 (quoting A.L. v. Commonwealth, 402 Mass. 234, 244 (1988)).
In the end, questions of causation — both proximate and intervening — will be for the jury to decide. Jones at 37Í (citations omitted). The court can say, however, that the defendants are not entitled, as a matter of law, to summary judgment on this issue.
Federal Court
The first allegation of legal malpractice involves the decision to pursue the underlying action in Federal Court, as opposed to State Court. With respect to this allegation, the court need only look to those defen *97 dants who were involved with the underlying case at the time the action was filed in Federal Court.[18]
According to the plaintiffs’ expert, Eric Nissen, Esq. (“Nissen”), this action departed from the standard of care expected from a competent attorney.
By allowing defense counsel to steer this case to Federal Court (which should have drawn the suspicion of plaintiffs counsel[19]), the Federal Rules of Civil Procedure applied which, contrary to state rules, made it difficult if not impossible to amend the complaint to add parties under these circumstances.
From the time the underlying action was filed until its ultimate resolution in 1989,[20] the Federal Rules of Civil Procedure, Rule 15(c), provided that:
Whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading. An amendment changing the party against whom a claim is asserted relates back if the foregoing provision is satisfied and, within the period provided by law for commencing the action against him, the party to be brought in by amendment (1) has received such notice of the institution of the action that he will not be prejudiced in maintaining his defense on the merits, and (2) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against him.
During the same period of time, Massachusetts’s Rules of Civil Procedure, Rule 15(c), provided that:
Whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction or occurrence set forth or attempted to be set forth in the original pleading, the amendment (including an amendment changing a party) relates back to the original pleading.
Clearly, as between the two rules, the Massachusetts rule was much more liberal in allowing amendments which would relate back to the initial complaint. See, Mass.R.Civ.P. Rule 15, Reporter’s Notes — 1973. Additionally, there is no dispute that, if the federal rule applied, the defendants would have been unable to amend the complaint in Federal Court to add additional parties under the circumstances presented here. Accordingly, if the plaintiffs can show that decision to proceed in Federal Court was a substantial factor in plaintiffs’ failure to fully recover damages in the underlying action, such a decision might conceivably constitute legal malpractice.
Ironically, though, each of the parties has argued facts which harm, rather than help their case.
The plaintiff alleges that the defendants had been “steered” to federal court by the defense counsel in the underlying case. The implication here is that defense counsel in the underlying action preferred to have the action proceed in Federal Court and that the defendants, somewhat blindly, allowed themselves to be led to a less favorable forum. Had the defendants in this case agreed with this characterization, the plaintiffs would be unable to base a malpractice action on the decision to file in Federal Court. This would be true because the defendants in the underlying case had every right to remove the case to Federal Court if that was their desire. As the Federal Court clearly had diversity jurisdiction over the underlying claims, the plaintiffs could not have opposed removal even if it had been sought by the defendants in the underlying case.
The defendants, however, have asserted that they were not, in any way, led to Federal Court but — to the contrary — chose to go to Federal Court as a tactical decision.[21] While it is true that courts should be hesitant to second-guess the legitimate tactics of a trial attorney, a defendant in a legal malpractice action cannot be shielded from every error simply by claiming that the error was really a “tactical choice.” Wagenmann v. Adams, 829 F.2d 196,220 (IstCir. 1987) (“[Wfithinwide limits, an attorney’s choice of trial tactics does not subject him or her to malpractice liability... [However,] failures to act. . . cannot be automatically swept under the rug by labelling them ‘trial tactics’ ”). If, as the defendants assert, the decision to pursue the action in Federal Court was a tactical decision, an issue of fact might emerge as to whether the defendants chose “between professionally acceptable alternative approaches .. . [or] blithely disregarded [their] client’s interests.” Id. Such an issue of fact would, of course, not be appropriate for summary judgment.
Such an issue only becomes material, of course, if the plaintiffs actually suffered harm by virtue of the choice of the federal forum. If, however, the plaintiffs suffered no harm by virtue of the defendants’ choice to proceed in Federal Court, the plaintiffs cannot maintain a malpractice action based on this allegation. Such is the case here.
The plaintiffs allege that, by bringing the underlying action in Federal Court (on the eve of the statute of limitations), the defendants foreclosed the possibility that additional defendants could be added to the action by way of amendment. As the court notes above, such amendments would most likely have been allowed under the more liberal Massachusetts rule.
The plaintiffs’ arguments on this point fail, however, because it is clear that — at the time the complaint was filed in Federal Court — the U.S. District Court for the District of Massachusetts, sitting in diversity, would have applied the more liberal Massachusetts rule.[22]
The general rule, of course, is that a federal court sitting in diversity applies state substantive law and federal procedural law. See, generally, Erie R.R. v. Tompkins, 304 U.S. 64 (1938); Hanna v. Plumer, 380 U.S. 460 (1965), and progeny. The court need not guess as to how the First Circuit or District Court would have answered the question at hand — whether Mass.R.Civ.P. 15 was to be considered procedural or *98 substantive for purposes of an Erie analysis — as those courts had repeatedly and unambiguously held that the rule was to be considered a substantive one.[23] Marshall v. Mulrenin, 508 F.2d 39, 43-44 (1st Cir. 1974); Covel v. Sqfetech, Inc., 90 F.R.D. 427, 430 (D.Mass. 1981). Moreover, the court need not guess as to how Federal Judge Robert Keeton, who presided over the underlying case, would have decided this issue in 1984. In Covel, supra, Judge Keeton held:
In summary, I conclude that Fed.R.Civ.P. 15(c), properly construed, does not govern the issue presented here, was not meant to override a state law of limitation allowing more liberal relation-back, and should not be applied when to do so would give it the practical effect of preempting a part of the state’s law of limitation of actions and is more liberal than the federal rule. Therefore I conclude that, Erie applies and that, in accordance with Marshall v. Mulrenin, Mass.R.Civ.P. 15(c) governs the question of relation-back in this case.
Id. at 433.
Clearly, then, when the underlying case was filed, the Federal District Court for the District of Massachusetts, and more specifically, Judge Keeton, would have applied Massachusetts’s Rule 15(c) concerning the relation back of amendments. Accordingly, the plaintiffs suffered no injury by virtue of the defendants’ decision to file the underlying action in federal court. As a matter of law, the plaintiffs cannot maintain an action for malpractice based on this particular decision by the defendants. Summary judgment is, therefore, appropriate on this issue.
Pre-Tribunal Discovery
The plaintiffs next allege that the defendants[24] committed legal malpractice by failing to conduct adequate pretrial discovery. The allegations here are two-fold: first, that such discovery might have provided sufficient evidence for the medical malpractice tribunal to permit the case to proceed against Dr. Collins without bond, and, second, that such discovery might have led the defendants to the identify of the so-called “phantom doctors.” As the court deals with the “phantom doctor” issue in depth, infra, it need only address the first allegation here.
The plaintiffs argue that had the defendants engaged in pre-tribunal discovery, they would have been able to present the medical malpractice tribunal with enough evidence for the tribunal to render a finding that if properly substantiated, was sufficient to raise a legitimate question of liability sufficient for judicial inquiry against Dr. Collins. Had this occurred, the plaintiffs would not have been required to post a bond to proceed against Collins. Further, given the correspondences contained in the record, it is reasonable to assume that had the tribunal so found, the defendants would have pursued the case against Collins. At trial, the plaintiffs will, of course, have to produce sufficient evidence to show not only that it is more likely than not that all of these events would have occurred but also that it is more likely than not that the action against Collins would have been successful.
The defendants have argued for summary judgment asserting that, even had they requested pre-tribunal discovery, they would not have been successful in this request. Therefore, the defendants’ argument goes, there was no harm in their failure to pursue pre-tribunal discovery.
This is not, however, a question which can be answered at summary judgment. Reported decisions offer no definitive answer to this question. Beeler v. Downey, 387 Mass. 609, 612 (1982) (“By the terms of [G.L.c. 231,] §60B, the screening tribunal must hear the action ‘within fifteen days after the defendant’s answer has been filed,’ thus limiting discovery significantly”) (emphasis added); Gugino v. Harvard Community Health Plan, 380 Mass. 464,467 (1980) (“[T]he hearing before the tribunal ordinarily precedes discovery . . .”) (emphasis added); Tibbitts v. Wisniewski, 27 Mass.App.Ct. 729, 730 (1989) (“Under the mistaken impression that no response to discovery was required until a medical malpractice tribunal had ruled, plaintiffs counsel did not dignify the defendant’s requests for discovery with a reply”). Moreover, as a practical matter, this court has not consistently ruled one way or another whether pre-tribunal discovery, when sought, should be allowed. As Judge Young wrote:
All of these motions raise the troubling issue of pre-tribunal discovery in a medical malpractice action . . . Absent guidance by appellate decision, this court has split on the issue: some justices permit pre-tribunal discovery routinely, others, just as routinely, deny it.
Albury v. Glidden (Suffolk Superior Court), Civil Action 44242 (Memorandum and Order on Motions, December 15, 1990), p.4. Judge Young proceeds to outline a number of factors to be considered by the court in determining whether pre-tribunal discovery should be allowed. While these factors may be useful to the parties in their attempt to show that pre-tribunal discovery would or would not be allowed, there is nothing within that case, or any other that the court is aware of, which would allow this court to decide this factual dispute at the summary judgment stage. Accordingly, summary judgment would be inappropriate on this issue.
The Phantom Doctors 1. All Defendants
The plaintiffs allege that the defendants committed legal malpractice by failing to identify and pursue other doctors (the “phantom doctors”) who may have been (at least partially) responsible for Mr. Attridge’s death. Specifically, the plaintiffs allege that the medical records were unclear as to whom extubated, and later reintubated, Mr. Attridge, and that the defendants were negligent in failing to identify these individuals and in failing to proceed against them.
*99 The defendants argue that, since the plaintiffs have yet to name the phantom doctor(s), there is no proof that they even exist and, accordingly, the defendants cannot be guilty of malpractice for failing to find potentially nonexistent doctors. Admittedly, there are few factual issues which, at this stage, can be deemed “certain” in this case. Even so, the court is relatively comfortable in stating that Mr. Attridge did not perform the extubation or the reintubation on himself. Additionally, it seems that Dr. Collins was not present at the hospital for either of these procedures.[25] This being the case, it follows that someone else — presumably a doctor — performed these procedures.
More to the point, however, the court finds it inconceivable that the defendants could not, through normal and reasonable discovery procedures, have identified the doctors who attended to Mr. Attridge.[26] Certainly the hospital must have kept records concerning which doctors were working in the ICU at the time of Mr. Attridge’s extubation and reintubation. Here too, the failure to identify and pursue these doctors — even after all four of the defendants’ expert witnesses opined that the phantom doctors, whoever they may have been, deviated from acceptable standards of care — can only be explained by virtue of the defendants’ ignorance of Massachusetts charitable immunity law.
If this failure to identify and pursue the phantom doctors is proved to be a substantial factor in the plaintiffs’ failure to recover more than $20,000, the plaintiffs will be entitled to recover in this action. The court notes that the plaintiffs still have a tough row to hoe on this issue. In addition to proving the legal malpractice, the plaintiffs will be required to prove by a preponderance of the evidence that the phantom doctors’ treatment of Mr. Attridge fell below the requisite standard of care and that this departure was a substantial factor in Mr. Attridge’s death. However, the opinions of the expert witness — which seem to indicate that this was precisely the case — illustrate that such proof may indeed be presented at trial. Accordingly, summary judgment on this issue is not appropriate.[27]
2. Langan Grossman
Langan Grossman has an additional argument concerning its alleged negligence with respect to the phantom doctors not available to the other defendants. Langan Grossman argues that, by the time it became involved in the case in August of 1986, it was too late for any additional defendants to be added to the case. Clearly, by the time Langan Grossman entered the case, the statute of limitations had run. This being the case, the only way that additional defendants could have been added to the underlying action would have been by virtue of Mass.RCiv.P. Rule 15(c), discussed above, which allowed amendments to a complaint to relate back to the date of filing.
The court’s earlier discussion noted that in 1984, the Federal Court, sitting in diversity, would apply the state rule as opposed to the more restrictive federal rule. One might assume, then, that when Langan Grossman entered the picture it could have amended the complaint to name the phantom doctors and that their failure to do so could (as outlined above) subject them to potential liability. Surprisingly enough, this was not the case.
On June 18, 1986 the United States Supreme Court issued a decision in Schiavone v. Fortune, 477 U.S. 21 (1986), a case involving a Rule 15 relation-back controversy. Although the court did not specifically address the Erie question discussed above, it implicitly assumed that the federal rule and not the more liberal state rule would apply. See, Pessotti v. Eagle Mfg. Co., 774 F.Supp. 669, 678 (D.Mass 1990) (discussing the holding of Schiavone, supra).
Schiavone immediately threw the district courts within the first circuit into disarray. Some courts ignored the dicta of Schiavone and continued to apply the state’s rule concerning amendments. See, E.G. Ciolino v. Sciortino Corp., 721 F.Supp. 1491, 1495 (D.Mass. 1989); Hernandez Moreno v. Serrano Marrero, 719 F.Supp. 70, 71 (D.R.I. 1989). Other courts applied the federal rule concerning amendments. See, Pessotti, supra, at 678 (explicitly holding that Schiavone overruled the First Circuit’s earlier decisions); Jackson v. Seagrave Fire Apparatus, Inc., 660 F.Supp. 326 (D.Me. 1987) (applying the federal rule without discussing the Erie/Marshall/Schiavone issue one way or another). Still other courts ducked the issue entirely. Burgos Martinez v. Rivera Ortiz, 715 F.Supp. 419,422 (D.P.R. 1989) (“In this case we do not face a diversity action, however, and can avoid the question of whether to follow Marshall or Schiavone”).
As if matters were not confused enough, the law took another unexpected shift in 1991 when Congress amended Federal Rule 15(c) to specifically indicate that, when a state rule provided for more liberal relation-back, the state rule should apply. According to the Advisory Committee’s notes, the amendment was in direct response to the implied holding of Schiavone. See, Advisory Committee Notes of the Committee on Rules of Civil Procedure, Rule 15(c). The First Circuit then decided, in Pessotti v. Eagle Mfg. Co., 946 F.2d 974, 980, n.6 (1991), that the proposed amendment mooted the controversy over which rule to apply and that the court need not “decide whether Marshall remained good law in the interim between Schiavone and the effective date of the amendment.” Id.
Luckily for this court, however, the one federal judge who did decide which law was good law during this interim period was none other than Judge Keeton.[28] In Presotti v. Eagle Mfg. Co., 774 F.Supp. 669, 678 (D.Mass. 1990), Judge Keeton wrote:
Were I writing on a slate no less clean than it was when Covel was before me, I would be inclined to adhere to the views I expressed in Covel. But the slate has more written on it now and from the highest source in the judicial system ... I conclude *100 that I should follow the implicit dictum of Schiavone. It is the best guidance available at this time as to how the Supreme Court will decide this issue in this case, should this case come before the Court. Accordingly, I conclude that Rule 15(c) of the Federal Rules of Civil Procedure governs relation back. . .
Itis clear, then, that as of June 18,1986, when Schiavone was decided (until 1991 when the federal rule was amended), Judge Keeton, when sitting on a diversity case, would apply the federal rule concerning the relation back of amendments. As noted earlier, the application of the federal rule would not have allowed an amendment of the complaint to add additional parties under the circumstances presented in the underlying case. Langan Grossman did not enter the picture until August 6, 1986 when Bimbaum joined the firm. Therefore, even if Langan Grossman had been able to identify additional defendants, it would have been impossible at that point to amend the complaint to add them as defendants. This being the case, the plaintiffs cannot show that the actions or omissions of Langan Grossman caused them any harm. Accordingly, Langan Grossman is entitled to summary judgment on the issue of the phantom doctors.
3. Giancola
Giancola also makes a number of arguments which apply only to the facts of his particular situation. Basically, Giancola’s argues that: 1. he was not negligent in instigating a suit against unknown defendants, and 2. even if he were negligent, such negligence did not cause the plaintiffs any harm as the subsequent attorneys could have corrected the alleged error by adding additional defendants. The court rejects both of these arguments.
Giancola’s first argument is that, far from being negligent, he is to be commended for not filing frivolous litigation since he had no evidence to show that any other doctors had harmed his client. This argument, however, ignores the true thrust of the plaintiffs allegation: that Giancola should have known if his client had been harmed by other doctors. The alleged negligence is that Giancola failed to adequately employ discovery and otherwise investigate the source of his client’s injuries. Giancola’s counterargument, that he did all he could do prior to the decision of the tribunal, has already been rejected. The question of whether Giancola used reasonable efforts on behalf of his client with respect to discovering and pursuing the phantom doctors, then, survives to the same extent as outlined above.
Giancola’s second argument, that he is not liable because subsequent attorneys could have corrected the alleged negligence, is flawed as a matter of law.[29] As the court has already noted above, even if the alleged errors could have been corrected after Giancola left the firm, this simply casts the attorneys who worked on the case after his departure as subsequent tortfeasors. If this were not the case, all parties could escape liability simply by pointing to the “but for” test. At trial, the appropriate factual question to be decided will be whether or not Giancola’s conduct was a substantial factor in the plaintiffs’ failure to recover damages from the phantom doctors. Summary judgment on this issue is, therefore, inappropriate.
Dr. Collins
1.All Defendants
The allegations concerning Dr. Collins can be broken down into three basic arguments: first, that the defendants were negligent in failing to properly investigate and substantiate the allegations against Dr. Collins prior to the tribunal hearing, second that the defendants were negligent in advising the plaintiffs not to post a bond to pursue Dr. Collins after the tribunal’s finding, and third, that the defendants were negligent in failing to pursue the litigation against Dr. Collins after the tribunal’s finding.
The issues concerning the defendants’ alleged failure to properly investigate the claims brought against Dr. Collins prior to the tribunal hearing are discussed in the section entitled “Pre-Tribunal Discovery,” supra, and need not be restated here. To the extent that the allegations here encompass more than just discovery (i.e. conducting an independent investigation), the outcome is the same: The question of whether the defendants fell below a reasonable standard of practice in their investigation of Dr. Collins’s negligence is a question of fact for the jury.
All of the defendants’ arguments concerning the decision not to post a bond (so as to proceed against Dr. Collins) involve highly disputed issues of fact. Basically, the defendants argue that given the fact that Dr. Collins was a highly respected surgeon and that Mr. Attridge had been seriously ill prior to his surgery, the decision not to proceed against the doctor was completely reasonable. The plaintiffs, however, argue, that the decision not to post a bond against Collins was premised on at least three rather significant misunderstandings concerning Massachusetts law. Specifically, the plaintiffs contend that the defendants’ advice could not have been reasonable as the defendants:
1. were ignorant of Massachusetts’s charitable immunity statute;
2. misunderstood the significance of an adverse tribunal decisions; and
3. advised Mrs. Schell — incorrectly—that the tribunal’s decision could be read into evidence at trial.[30]
It is inconceivable to the court how a decision premised on a misunderstanding of the law could be considered “reasonable.” In any event, though, the question of the defendants’ reasonableness with respect to their advice to Mrs. Schell, is a factual issue to be decided by a jury.
Finally, with respect to the argument concerning the defendants’ continuing failure to proceed against Collins, the analysis — so far as the defendants are *101 concerned generally — is the same. This particular issue is only relevant as it applies to Langan Grossman and, as such, is discussed below.
2. Arabian
Arabian argues that the decision concerning whether a bond should have been posted was outside the limited scope of his employment and, as such, he cannot be held liable for any harm flowing from this decision.
It is true that, “(i]n a legal malpractice action it is not sufficient merely to prove an attorney-client relationship existed with respect to some matters. It is necessary to establish that the relationship existed with respect to the act or omission upon which the malpractice claim is based.” Page v. Frazier, 388 Mass. 55, 62, n.10 (1983) (citations omitted). See also, Robertson v. Gaston Snow & Ely Bartlett, 404 Mass. 515, 522 (1989) (citations omitted) (“[T]he fact that an attorney agreed to, or did, represent a client in a particular matter does not necessarily create an attorney-client relationship concerning other matters or affairs of that client”).
This having been said, it seems clear that the scope of Arabian’s involvement with the decision not to post a bond is yet another hotly contested issue. This time, however, it is the defendants who are fighting amongst themselves. Birnbaum and Giancola seem to suggest that the decision not to post a bond was, at least in part, based on erroneous information provided by Arabian. Specifically, documents provided by the parties suggest that it was Arabian who failed to research the issue of charitable immunity and provided incorrect information concerning the significance of the tribunal’s decision and the admissibility of the tribunal’s decision at the trial. Arabian, of course, denies these allegations and has provided his notes on the underlying case which suggest that Birnbaum and Giancola were aware of the charitable immunity statute. Arabian’s notes further seem to indicate that he was led to believe that Mrs. Schell would not post a bond regardless of his advice. Clearly, this issue presents yet another factual issue to be decided by the jury.
Similarly unpersuasive is Arabian’s argument that he is entitled to summary judgment on this issue since he never personally advised Mrs. Schell not to post a bond. Arabian was part of a trial team working for Mrs. Schell. As noted above, the decision not to post a bond was based, at least in part, on erroneous information provided by Arabian. If Mrs. Schell reasonably relied on her attorneys’ advice concerning the posting of the bond, she was entitled to rely on the advice of all of the members of the trial team who had input into that decision.
3. Langan Grossman
Clearly, as a matter of practicality, Langan Gross-man could not have played any role in the initial decision not to post a bond against Dr. Collins. Accordingly, they are entitled to summary judgment on that issue.
The only remaining question, then, is whether Langan Grossman can be held liable for not pursuing Dr. Collins by posting a bond when they became involved in the case. As a matter of law, however, Langan Grossman would have been unable — five months after the tribunal’s decision — to file a bond so as to pursue the case against Dr. Collins. G.L.c. 231, §60B provides that:
If a finding is made for the defendant or defendants in the case the plaintiff may pursue the claim through the usual judicial process only upon filing bond ... If said bond is not posted within thirty days of the tribunal’s finding the action shall be dismissed.
Given the mandatory language of the statute, the court has allowed only the narrowest of exceptions. In Gold-stein v. Barron, 382 Mass. 181 (1980), the court allowed a §60B bond to be filed one day late because the failure to file within 30 days was due to the unsettled certainly of the law concerning when the 30-day period would begin to run. Specifically, the court held that the attorney’s misinterpretation of the statute constituted “excusable neglect.” Id. at 186. The Goldstein court also noted that “[a] flat mistake of counsel about the meaning of a statute or rule may not justify relief: relief is not to be extended ‘to cover any kind of garden-variety oversight.’ ” Id. at 186 (quoting Pasquale v. Finch, 418 F.2d 627, 630 (1st Cir. 1969)). The situation presented in the underlying action was clearly distinguishable from that in Gold-stein. The neglect involved in the failure to file a bond against Dr. Collins within 30 days of the tribunal’s decision — if it was indeed neglect — was based not on a minor misinterpretation of a subtle or complex issue of law, but rather total ignorance of the state’s charitable immunity statute and a complete misinterpretation of the relevance of a tribunal decision. Relief under Mass.R.Civ.P. 6(b) would not have been available to Langan Grossman even if it attempted to file a bond when it entered the case. Id. See also, McMahon v. Glixman, 379 Mass. 60, 64 (1979) (holding that, in the absence of error on the part of the medical malpractice tribunal, the plaintiff may not file a bond past the 30-day limit).
It follows, then, that Langan Grossman cannot be held liable for malpractice for the failure to post a bond.
Charitable Immunity
None of the defendants moving for summary judgment have presented a direct argument concerning why they are entitled to summary judgment on this issue. To the extent that the defendants do address this issue, it is in connection with issues which are already discussed above. As with the issues discussed above, Langan Grossman is entitled to summary judg *102 ment. Even had Langan Grossman informed Mrs. Schell of the charitable immunity statute when it entered the case, the damage was already done. No additional defendants could have been added to the case. This being the case, Langan Grossman was not the cause of the plaintiffs’ failure to recover. With respect to the other defendants, however, the issue survives for trial.
The Daughters
1. All Defendants
The final allegation of malpractice is that the defendants were negligent in failing to notify the decedent’s daughters of their rights under the Commonwealth’s wrongful death statute and in failing to pursue said rights. The defendants argue that there can be no finding of malpractice as the daughters were never clients of any of the defendants and, therefore, no duly was owed them.
There are, in actuality, three issues which the court must decide with respect to the daughters: 1. whether the defendants had a duty to notify the daughters of their rights under the wrongful death statute (and pursue said rights); 2. whether the defendants were negligent in their failure to detail the daughters’ damages in the underlying complaint; and 3. whether the daughters are proper plaintiffs in the current action.
The first issue need not delay the court for long. The wrongful death statute, G.L.c. 229, §1, provides that an action for wrongful death may be brought:
by the executor or administrator of the deceased person, to the use of the following persons and in the following shares:
... (3) If the deceased shall have been survived by a wife or husband and by more than one child surviving either in person or by issue, then one third to the use of such surviving spouse and two thirds to the use of such surviving children or their issue by right of representation.
The plain language of the statute, as well as caselaw, indicates that the only person who has standing to bring a wrongful death action is the decedent’s executor or administrator. In Marco v. Green, 415 Mass. 732 (1993), the court held that:
In Gaudette v. Webb, 362 Mass. 60 (1972), this court explained that . . . [G.L.c. 229] established procedures for the recovery of damages the substantive right to which is anchored in the common law. Id. at 71 .. . One such procedure is the requirement that the “executor or administrator of the deceased,” rather than any beneficiary of the estate as such, act as the plaintiff in a wrongful death action brought on behalf of the designated categories of beneficiaries.
Id. at 735. See also, Santos v. Lumberman’s Mutual Casualty Co., 408 Mass. 70, 78 (1990); Minkley v. MacFarland, 371 Mass. 891 (1976).
Clearly, Ms. Schell, as executrix of the decedent’s estate, was the only person who could maintain an action for the wrongful death of Mr. Attridge. Admittedly, both the daughters would have benefitted from the wrongful death action had it been properly pursued, but this fact goes to the question of whether the daughters are proper plaintiffs in this action, not whether the defendants had a duty to notify the daughters of the pendency of the underlying action. As Ms. Schell was the only person who could maintain the underlying action, there was no negligence on any defendant’s part for failing to pursue separate claims on behalf of the decedent’s daughters. To the extent that the complaint can be read to suggest that the defendants should have pursued separate claims for the daughters, summary judgment is appropriate.
The plaintiffs, however, contend that the defendants have simply misconstrued their argument. According to the plaintiffs, their allegations of negligence in this area are not that the daughters should have been named as individual plaintiffs in the underlying action, but rather that the defendants should have specifically investigated and detailed the daughters’ damages in pursuing the underlying case on behalf of the estate.
Section 2 of G.L.c. 229 provides, in relevant part, that:
A person who (1) by his negligence causes the death of a person . . . shall be liable in damages in the amount of (1) the fair monetary value of the decedent to the persons entitled to receive the damages recovered, as provided in section one, including but not limited to compensation for the loss of reasonably expected net income, services, protection, care, assistance, society companionship, comfort, guidance, counsel, and advice of the decedent to the persons entitled to receive the damages recovered
Properly understood, then, the plaintiffs’ allegation is that by failing to detail the daughters’ damages in the complaint and in failing to attempt to make said damages part of the wrongful death action, the defendants ensured that — had the matter gone to trial — the plaintiffs’ potential recovery would have been less than it should have been. While this may be true, it is important to note that this issue will take on significance only if the plaintiffs can first prove one of their other allegations of malpractice.
Standing alone, this particular allegation goes nowhere. This is so because this particular allegation relates only to the measure of the plaintiffs’ damages. If the defendants were not negligent in only recovering against the hospital, this final allegation becomes moot. It would not matter whether the wrongful death claim was worth $500,000 or $5 million if the only defendant against whom the plaintiffs could have recovered was protected by the $20,000 charitable immunity cap. However, if the plaintiffs can prove that *103 the defendants were negligent in failing to post a bond and proceed against Collins, or that they were negligent in not proceeding against some other identifiable individual, this issue will emerge as a relevant factual dispute. As such, summary judgment on this point would be inappropriate.
Finally, there seems to be some question as to whether or not the daughters are proper plaintiffs in the current legal malpractice action.[31] The defendants argue that neither of the daughters were their clients and, accordingly, they owed them no duty.
Generally, in legal malpractice actions, the duty of care indeed arises from the existence of an attorney-client relationship. Spinner v. Nutt, 417 Mass. 549, 552 (1994) (citing 1 Mallen & Smith, Legal Malpractice §8.1 (3d ed. 1989)). However, the Spinner court further noted that:
an attorney is not “absolutely insulated from liability to nonclients.” Page v. Frazier, 388 Mass. 55, 65 (1983).“ [A]n attorney owes a duty to nonclients who the attorney knows will rely on the services rendered.” Robertson v. Gaston Snow & Ely Bartlett, 404 Mass. 515, 524, cert, denied, 493 U.S. 894 (1989).
Id. at 552. The most common application of this principal is where the intended beneficiaries of a will — who fail to take because of the attorney’s negligent drafting or execution of the will — sue the drafting attorney for legal malpractice. In such cases, many courts have held that the intended beneficiaries may sue the attorney for legal malpractice despite the lack of an attorney-client relationship. See, Spinner, supra, at 544; Logotheti v. Gordon, 414 Mass. 308, 311 (1993) (and cases cited therein). The plaintiffs in this case argue that the daughters are analogous to intended beneficiaries.
The defendants, however, cite a different line of cases where the court has held that an attorney for a trustee owes no duty to the beneficiaries of a trust. Spinner, supra; Logotheti supra. Both courts held that, if an attorney for a trustee were held to owe a duty to the beneficiaries, the attorney would be subjected to potentially conflicting duties. Spinner at 552-54; Logotheti at 312. The Spinner court noted:
That the interests of the trustee and the interests of the beneficiaries may at times conflict cannot seriously be disputed . . . Should we decide that a trustee’s attorney owes a duty not only to the trustee but also to the trust beneficiaries, conflicting loyalties could impermissibly interfere with the attorney’s task of advising the trustee. This we refuse to do.
Id. at 553.
The defendants argue that this second line of cases is more analogous to the case at hand. The court does not agree. In Logotheti the court explained that the distinction between the will cases and the trust cases was that, in the will cases,
there is no conflict between the duty the attorney owes to his or her client and the duty the attorney owes to intended beneficiaries. The beneficiaries, like the testator, want the will allowed.
Id. at 311. See also, Spinner at 554 (quoting the above language). Clearly, in the underlying case, the interests of the daughters were identical to the interests of Ms. Schell who was acting in her capacity as administratrix of Mr. Attridge’s estate. All three wanted to recover as much money as possible from those responsible for Mr. Attridge’s death.[32] Indeed, as administratrix of Mr. Attridge’s estate, Ms. Schell was bound to bring the action for the benefit of herself and Mr. Attridge’s daughters. G.L.c. 229, §1. Moreover, to the extent that the court has held that an attorney should owe a duly to a nonclient only when the attorney has reason to know that the nonclient is relying on his or her services, the case at bar provides just such a case. The wrongful death statute outlines exactly who will benefit from the attorney’s services and in what percentages. Likewise, it is completely foreseeable who will be harmed if the lawyer performs these services negligently. This being the case, the court holds that the daughters are properly named as plaintiffs to this action.
There is one additional reason why the court holds as it does. The court has repeatedly held that, “when one person, for a valuable consideration, engages with another, by simple contract, to do some act for the benefit of a third, the latter, who would enjoy the benefit of the act, may maintain an action for the breach of such engagement.” Spinner at 555 (quoting Rae v. Air-Speed, Inc., 386 Mass. 187, 195 (1982) (quoting Brewer v. Dyer, 7 Cush. 337, 340 (1851))). The wrongful death statute, as noted above, leaves no question but that the decedent’s administrator or executor brings a wrongful death action for the benefit of the decedent’s surviving spouse and/or children. As such, the daughters were clearly third-party beneficiaries of the contract between Ms. Schell and the defendants. As such, the daughters have standing to maintain this action. Summary judgment is therefore inappropriate on this issue.
2. Langan Grossman
As the court noted above, this allegation is only relevant if the plaintiffs can first show negligence with respect to one of their earlier claims. As the court has allowed summary judgment in favor of Langan Gross-man on all of the earlier claims, it must do so here as well. By the time the Langan Grossman was involved in this case, it was too late to proceed against anyone except the hospital. As such, the failure to detail the daughters’ damages was irrelevant.
*104 3. Giancola
Giancola argues that he cannot be held liable for failing to detail the daughters’ damages as he had left the firm before the case ever reached the trial stage. Again, however, Giancola could be held liable if a jury were to find that he was negligent in failing to investigate and/or detail the daughters’ damages and that such negligence was a substantial factor in the plaintiffs’ failure to recover damages. Giancola was working on the case when the complaint was filed and when the case was heard before the medical malpractice tribunal. As such he was present during times when such damages could have been investigated. The fact that others may also have later failed to investigate these damages does not relieve Giancola of liability for his own negligence, if any.
4. Arabian
Arabian again argues that he cannot be held liable as the duty to investigate and/or detail the daughters’ damages were outside the scope of his employment. The court again rejects this argument as inappropriate for a determination at summary judgment.
93A Action
Langan Grossman has also moved for summary judgment on the 93A count. As the court has held that Langan Grossman is entitled to summary judgment on all of the underlying acts on which the 93A count is based, summary judgment is appropriate on this count as well.
ORDER
For the reasons outlined above, defendants Giancola and Arabian’s motions for summary judgment are ALLOWED with respect to the decision to file the underlying action in Federal Court and to the extent that the complaint can be read to allege negligence for failing to name Mr. Attridge’s daughters as plaintiffs in the underlying complaint. With respect to the phantom doctor issues, Giancola and Arabian’s motions for summary judgment are DENIED without prejudice. If appropriate, defendants may again move for summary judgment on this issue at the close of discovery. With respect to all other issues, Giancola and Arabian’s motions for summary judgment are DENIED.
Also for the reasons outlined above, Langan Grossman’s motion for summary judgment is ALLOWED.
It is Further Ordered that future proceedings in this matter shall be governed by the rulings made in this memorandum of decision.

At oral argument, the defendants argued that the only expert medical opinions which should be considered by this court are those opinions which had been obtained by the plaintiffs prior to the medical malpractice tribunal. One of the allegations which the plaintiffs have made in this case, however, is that the defendants failed to secure proper expert testimony prior to the medical malpractice tribunal. There is no reason to infer that the medical opinions now offered could not have been obtained with the exercise of due care by the defendants. Thus it is untenable that the Court should not consider such evidence on this motion.

The hospital records contain no mention of any of those tests being performed prior to the extubation.

It is clear that Dr. Collins was not present at the hospital during this period of time. Dr. Collins’s deposition testimony is that he first saw Mr. Attridge post-operatively on July 16 at approximately 6 a.m. Collins Deposition at 57.

Again, the records do not indicate precisely who performed the reintubation. Some of the experts believe that the records support a conclusion that the reintubation was performed by an unnamed anesthesiologist.

Ms. Schell was, at the time, known as Ms. Attridge.

During the pendency of the underlying litigation, the firm’s name changed a number of times. With the exception of the firm’s final incarnation, “Birnbaum & Rojas, P.C.,” the court refers simply to “Birnbaum Manaker.”

There is some dispute as to whether Birnbaum and/or Giancola had been held out as experts in medical malpractice actions. The court, however, need not decide this issue for purposes of this motion.

Ms. Schell, as executrix of the decedent’s estate, was the proper plaintiff for the underlying wrongful death action. See, G.L.c. 231, §60B.

The motion to dismiss was filed by the defendants but the motion itself indicates that it was the plaintiffs desire to proceed in Federal Court.

Judge Keeton, who had been assigned the underlying action, referred the action to the Superior Court for a medical malpractice tribunal on July 16, 1985.

The parties dispute how these updates should be interpreted and clearly this is a question of fact.

The defendants had told Dr. Battle — incorrectly—that Dr. Collins left for vacation immediately after surgery.

The defendants, however, presented the tribunal only with the opinions of Drs. Battle and Ikens.

As is discussed in greater detail below, the court need not determine the reasonableness of the defendants’ actions, as this is a question especially suited for a jury.

One of the plaintiffs’ allegations is that the defendants consistently misunderstood the import of the medical malpractice tribunal’s findings. Giancola’s deposition testimony suggests that — even now — he misinterprets the import of the tribunal’s findings. The tribunal’s finding in favor of Dr. Collins did not mean that no malpractice had occurred, simply that the plaintiffs offer of proof with respect to Dr. Collins was insufficient to raise a legitimate question of liability appropriate for judicial inquiry.

By failing to identify to pursue the phantom doctors (or Dr. Collins), the defendants limited Ms. Schell’s recovery to $20,000.

The court has long held this to be the case in other, analogous situations such as the case where a bodily injury caused by one tortfeasor is later aggravated by the action of a second tortfeasor. “The law is well settled that, in an action of tort for negligence causing bodily injury, the negligence of a physician, properly chosen, in treating that injury does not destroy the causal connection between that injury and the consequent suffering, even so much of the suffering as arises from the negligent treatment and would not have arisen if the injury had been properly treated." Carter v. Shirley, 21 Mass.App.Ct. 503, 510 (1986) (and cases cited therein).

Clearfy, there can be no argument that Langan Gross-man should be held liable for any negligence arising from the filing of the complaint in federal court as Langan Grossman entered the underlying action almost two years after the *105 complaint had been filed. Additionally, as the statute of limitations had clearly run by this point, there is no argument that the action could somehow have been dismissed from Federal Court and refiled in State Court. Indeed, plaintiffs make no argument that Langan Grossman could somehow have corrected the “mistake” of filing in Federal Court. Accordingly, this claim could only stand against the remaining defendants, if at all.

In referring to “plaintiffs counsel,” the expert is, of course, speaking of the defendants who, in the underlying action, were plaintiffs counsel.

The rule was subsequently amended in 1991.

Letters exchanged between Arabian and Birnbaum Manaker support the defendants’ contention that they chose to remove the action to federal court.

 As is explained in greater detail below, the federal courts within the first circuit would have applied the more liberal Massachusetts rule through June of 1986 (when a contrary Supreme Court decision was decided) and again starting in 1991 (when Congress amended the rule to counter said Supreme Court decision). For the purposes of this section, however, the only issue is what rule the federal court would apply at the time the defendants decided to proceed in Federal Court not what rule would later apply.

The Court in Marshall explicitly recognized that its holding on this matter conflicted with other circuits. The court declined to follow the circuits which followed a contrary result. Marshall v. Mulrenin, 508 F.2d 39, 45 (1st Cir. 1974).

Again, as Langan Grossman was not part of the underlying litigation until well after the medical malpractice tribunal decision, Langan Grossman cannot be held liable for any negligence arising from a failure to conduct pre-tribunal discovery.

This does not mean that the plaintiff could not have prevailed against Dr. Collins for medical malpractice. If the facts had supported such a finding, Dr Collins could have been found negligent in his supervision of (or instructions to) the phantom doctor(s).

Due to the passage of time it may well be more difficult, at this stage, for the plaintiffs to identify the phantom doctors.

With the exception of Langan Grossman for whom summary judgment is allowed on this issue. See, infra.

Judge Keeton also specifically noted that then-proposed amendment to Rule 15(c), “only emphasizes the fact that Schiavone has been interpreted as being inconsistent with Marshall" Pessotti supra, at 679. Keeton further held that, since the proposed amendment was not yet in force, the implied holding of Schiavone — applying the federal rule concerning the relation back of amendments — had to apply.

In hindsight, Giancola’s argument would also fail because, as the court has already noted, the subsequent attorneys could not have corrected the failure to name the phantom doctors. The court does not, however, base its decision today on this point. At the time Giancola left the firm, Schiavone had not been decided and, accordingly, the complaint could still have been amended. Whatever else Giancola may be liable for, he cannot be held liable for his failure to predict how the Supreme Court would decide Schiavone (and how the courts would later interpret that decision).

While the somewhat ambiguous drafting of G.L.c. 231, §60B might lead one to conclude that the tribunal’s findings were admissible at trial, the court clearly rejected this interpretation in Beeler v. Downey, 387 Mass. 609, 618 (1982). See also, Peter A. Donnovan, “Medical Malpractice Tribunal Admissibility of Tribunal’s Decision,” 24 Ann.Surv.Mass.L. 370 (1982).

To a certain extent, the parties have mixed together the various arguments on this issue. The parties’ arguments concerning duties owed to a non-client more appropriately belong in this portion of the discussion.

Any recovery would have been split according to the statutory scheme outlined in G.L.c. 229. There would not, then, be any danger of a dispute between Ms. Schell and the daughters concerning the distribution of any funds recovered in the underlying action.